IN THE MATTER OF RICHARD L. BARBOUR, AN ATTORNEY AT LAW.

Argued September 14, 1987—Decided January 15, 1988.

144

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Herbert J. Stern* argued the cause for respondent (*Hellring, Lindeman, Goldstein, Siegal & Stern,* attorneys; *Herbert J. Stern* and *Jeffrey Speiser,* on the brief).

PER CURIAM.

This is an attorney-disciplinary case in which the Disciplinary Review Board (DRB or Board) determined that respondent, Richard L. Barbour, had committed a number of ethics violations relating to his representation of three different clients. These infractions included a failure to perform expected and necessary legal services, gross negligence, fee overreaching, and inadequate record keeping, reflecting adversely on respondent's fitness to practice law. The Board also considered mitigating factors relating to respondent's medical illness and alcoholism. The DRB recommended a suspension of two years as appropriate discipline.

The facts, as well as the inferences to be drawn from the facts, are quite complicated. Our independent review of the record brings us to a somewhat different estimation of the nature and gravity of respondent's wrongdoings. Our assessment of the wrongs is tempered in some measure by according greater weight to the mitigating factors, leading us to impose lesser discipline than recommended by the Board. We therefore set forth at length our understanding of the record, dealing initially with the charged ethics violations in each of the matters, and then with the mitigating factors.

I.

A.

Defendant represented the estate of Walter H. Bachmann, who died on November 5, 1972, a resident of Burlington County. In his will the decedent named his daughter as execu-

trix of the estate. On November 10, 1972, respondent was retained to represent the estate both as an attorney and as an accountant, at an agreed fee of 5% of the estate and a $10,000 retainer. It was anticipated that it would take about two years to close out the estate.

Part of the charges against respondent relate to his alleged mishandling of the estate in terms of obtaining property valuations. The estate property consisted of a house and ninety-six acres of unimproved land. Respondent retained an appraiser, who was acceptable to the heirs, to evaluate the estate property. By letter dated December 15, 1972, respondent informed the heirs that the appraiser believed that the value of the property to be about $6,000 per acre and could realize up to $8,500 per acre. The property, at that time, was subject to a one-year moratorium. As a result, the appraiser believed it was impossible to "clearly estimate the effect of the moratorium on land values." Nevertheless, the formal appraisal report dated January 5, 1973, listed the fair market value at $486,100, an average per acre value of $5,400.

Respondent prepared all of the estate tax returns and income tax returns based on the appraisal. The estate tax return was audited in October 1973. The tax was then reduced by $21,612 because of the inclusion of the executor's commission and the real estate commission, which had not originally been listed as deductions. The resulting estate tax was approximately $115,-000. Respondent, on January 30, 1974, successfully petitioned the Internal Revenue Service to permit the heirs to pay this tax over a ten-year period.

Respondent also attempted to sell the property. The heirs rejected offers of $4,500 an acre, believing the property was worth between $6,000 to $8,000 an acre. There were at least two sale prospects for the homestead property for which respondent had drawn up the contracts, but in each case the sale was not completed. In October 1974, an agreement of sale was entered into for $476,112, reflecting a per-acre price of $5,600

for about 85 acres. However, the sale was subject to several contingencies, and when it had not been completed by 1976, respondent was successful in having the $10,000 deposit forfeited to the estate.

The homestead property was eventually sold in 1975 for $70,000. Before that sale was completed, respondent was successful in having an IRS lien removed and placed only against the vacant property.

In late 1976 or 1977 the federal government revoked the estate's ten-year payout agreement for delinquency. In late November or early December 1978, respondent was advised that the IRS would seize and sell the estate property for unpaid taxes. Because of the problems the estate was having selling the property, respondent suggested an "offer in compromise" in which the heirs would pay a portion of the taxes less than the amount due in settlement of the total claims. That offer, filed in January 1979, was initially rejected by the IRS because it had not been accompanied by a deposit check; however, it was accepted after respondent resubmitted the offer with a $50,000 check in the spring of 1979.

After the statute of limitations for amending the tax returns had expired, the property became subject to more extensive restrictions under the New Jersey Pine Lands Comprehensive Management Plan. Another appraisal was obtained showing that the property was subject to various moratoriums and had been unsuccessfully marketed; as a result the property had little or no market value. Following negotiations, the IRS accepted the new valuation, resulting in the elimination of any tax due and a refund of the $50,000.

The major criticism of respondent's conduct in this matter is that he mishandled a simple estate. According to the District Ethics Committee (Committee), the issues in the estate were not particularly complex "but were made so as a result of Mr. Barbour's failure to appreciate the impact of the moratorium on the tract and contemplate that contingency in dealing with the

estate." The Committee also found that respondent showed a "lack of business acumen in the negotiation of the contract of sale in that it was nothing more than a glorified option, with standards so one-sided as to require no real commitment on the part of the purchaser." It held that respondent's failure to grasp basic threshold concepts of estate management constituted gross negligence.

The DRB, which accepted the Committee's findings, concluded that respondent's efforts in this matter constituted gross negligence. It believed that there is and could be no dispute that respondent expended much effort and time on this matter. Nevertheless, it found that the estate became complicated because of respondent's failure to appreciate the impact of the moratorium on the tract.

From this record it is certainly arguable that the proofs indeed preponderate in favor of a conclusion that respondent mishandled this estate and failed to perform in accordance with the standards applicable to an attorney skilled and knowledgeable in estate work. Nevertheless, we are unable to conclude that the evidence is clear and convincing that respondent was guilty of gross negligence. Our lack of conviction under this burden of proof is influenced by the fact that respondent relied on an appraiser; he apparently accepted the $4,500 per acre valuation because the moratorium was to be lifted within a year. Moreover, the heirs sought to sell the property at comparable valuations and, for a time, it appears there were potential purchasers. It is not suggested that had the property initially been assigned a nominal value because of the moratorium, this would then have been accepted earlier by the IRS. As noted, the respondent later was able to withdraw the offer in compromise and obtain a refund of the $50,000. An IRS attorney familiar with the estate was not especially critical of respondent's handling of the estate, and suggested that the lack of marketability of the land was not a simple consideration, particularly in light of the sales contract price of $476,112. Another attorney also believed that the valuation of the estate was not a

simple matter, particularly since value as of the date of the death is the standard. Moreover, the respondent did initially obtain unusually favorable treatment in terms of a ten-year pay-out plan.

Nevertheless, there was an extremely long delay in finally straightening out and resolving the estate. And, it may be that the contracts of sale could have been drawn more favorably to the estate. We are satisfied that the delay was in large measure attributable to respondent's inattentiveness, neglect, poor judgment, and a lack of professional perceptiveness, as found by the tribunals below. We therefore determine that there was a breach of ethics involving neglect of a client's interest contrary to Disciplinary Rule 6–101(A)(2).

Another criticism of respondent relates to excessive fees. Respondent maintained that he had informed the heirs that his fee could exceed the 5% he had stated in his original retainer; he also claimed that it was not contemplated that the fee would automatically be decided by the probate court. Respondent said that he had discussed his fees with the heirs in 1976, and it was orally agreed that his fee would be $27,500. Respondent claimed that before engaging in the offer and compromise, he made a new arrangement with the executrix, Mrs. Matthews, in which they agreed on a fee of one-third of savings over the $50,000 offer in compromise. He therefore billed the estate for $16,670, which represented one-third of the $50,000 refund. This was in addition to the total fee of $22,500, which he had previously received. He conceded that his actual billing was over 5% and that it was not approved by the Burlington County Probate Court. Mrs. Matthews testified before the ethics committee that when she received respondent's bill of $16,670, which represented one-third of the $50,-000 refund, she was "shocked".

The Committee determined that respondent's fees were "substantially higher than those customarily charged by practitioners in the area." It further found that the fees were unreason-

able, finding that the $16,667 for the return of the $50,000 constituted overreaching. However, it did not find by clear and convincing evidence that there was an intent to overreach. The DRB likewise concluded that respondent's fees were excessive, but also did not believe there was an intent to overreach.

Part of the difficulty in determining the charge of fee overreaching is engendered by the change of circumstances relating to the valuation of the estate and its derivative impact on the ultimate tax liability of the estate and the legal services entailed in dealing with these changes.

While respondent claims that the $22,500 fee he received for his work performed over a seven-year period is "hardly excessive," much of the delay and confusion is attributable to respondent continuing to procede on a contingency basis. On the other hand, it does not appear, at least by clear and convincing evidence, that it was improper for respondent to have entered into a new fee arrangement reflecting the change of circumstances surrounding the valuation of the property. We nevertheless concur in the findings of both the Committee and the Board that the fees charged by respondent did not fully take into account respondent's own mishandling of the estate, and consequently could be said to be overreaching. We are satisfied that respondent's conduct in this matter constituted a breach of ethics contrary to Disciplinary Rule 2–106(A).

## B.

Marlin Kratzer and his wife had been clients of respondent. Some time prior to June 28, 1977, Mr. and Mrs. Kratzer consulted respondent to draft a will for Mrs. Kratzer who was ill and had no will. The major asset of the estate was their home, the deed for which was in Mrs. Kratzer's name only, although the mortgage was signed by both. According to Mr. Kratzer, his wife wanted to leave everything to him. When Mrs. Kratzer died on June 28, 1977, no will had been executed by her. Respondent represented Mr. Kratzer as administrator

of his wife's estate, which consisted of the home and about $12,000. Also surviving Mrs. Kratzer were three adult children from her former marriage.

Mr. Kratzer and the surviving children did not get along and the children wanted Mr. Kratzer out of the house. Within a short time after Mrs. Kratzer's death, her daughter, Mrs. Joyce Hambacher, retained an attorney, Harold L. Kaplan, to represent the children's interests regarding the estate.

Respondent admittedly took no action regarding the marital home for about six months, knowing that the children would inherit the home directly by operation of law. By letter dated September 6, 1977, Mr. Kaplan asked respondent to supply certain information. Respondent replied about two months later, apologizing for the delay but stating that he had been "out ill for the better part of the month." He answered some of the questions. Respondent claimed that an appraisal had been requested but had not been conducted. Respondent failed to respond to subsequent letters and telephone calls from the attorney. As a result, that attorney in June 1978 filed an action to partition the house.

Respondent also took it upon himself to attempt to sell the home. This process, somewhat delayed because of respondent's illnesses, was also delayed because of real estate market conditions and Mr. Kratzer's refusal to sell the house because he believed it belonged to him. Apparently, Mr. Kaplan also believed that a sale of the house privately would be advantageous to his clients.

The house was listed for sale in July 1978 for $49,000. A contract of sale for $36,500 was agreed to in March 1979. However, Mr. Kratzer refused to sign the contract, reflecting his belief that the home was his since he had paid for it. Mr. Kratzer blamed respondent for this situation and at least three times sought to replace him as his attorney. According to respondent, he would forward his file to his possible successor,

who would months later return it. Mr. Kratzer reluctantly left the premises when it was sold in June 1979.

Mr. Kaplan assumed responsibility for the closing and requested that all funds from the sale be sent to him. However, the proceeds from the sale of the house were not distributed for a considerable period of time.

By letter dated September 18, 1979, respondent forwarded a proposed distribution of assets to Mr. Kaplan, enclosing refunding bonds and releases. Threatening court action for lack of cooperation, Mr. Kaplan, by letter dated January 3, 1980, in turn demanded that respondent resolve certain questions about the final accounting so the estate could be closed. As a result of all of this, by January 26, 1980, Mr. Kratzer had still not received an estate distribution check leading him to advise respondent that he would file an ethics complaint. Respondent did not answer that letter, and a complaint was filed on March 7, 1980.

On March 27, 1980, the court disallowed the funeral expense against the estate and imposed it against Mr. Kratzer. It also deducted $900 from Mr. Kratzer's share to be distributed to the three children because of respondent's failure to earn interest on estate funds. Respondent was to reimburse Mr. Kratzer for this. The final distribution of estate assets occurred on September 3, 1980.

At the ethics hearing, Mr. Kratzer acknowledged that he had moved about six times over a two or three year period after he left the marital premises. He did not recall whether he advised respondent's office of his new address after each move. Respondent also testified that he had suffered from a serious medically disabling condition. See discussion *infra* (at 157–59). The Committee concluded that respondent's handling of this estate constituted gross negligence, that he failed to seek the lawful objectives of his client, and that his conduct adversely reflected upon his fitness to practice law. The Committee also concluded that respondent's handling of this case and the

Matthews matter demonstrated a pattern of neglect. The DRB concurred in these conclusions.

We are satisfied that the evidence in this case demonstrates clearly and convincingly that respondent mishandled the Kratzer estate. At the very least this mishandling of the estate showed neglect consisting of inattentiveness, delay, inadequate cooperation, and a failure to communicate. However, there were unusual difficulties engendered by the non-cooperation of his own client, the administrator of the estate. We are therefore satisfied that respondent was guilty of neglect in the handling of the matter contrary to Disciplinary Rule 6–101(A)(2).

## C.

In 1976 respondent was retained by Anthony Massarella, age 75, to help him with financial matters. Respondent was advised that Mr. Massarella's daughter and nephew, who had been close to him and handled his finances, had depleted his bank accounts. The investigation revealed that withdrawals had been made from the bank account and there were no funds left. Mr. Masserella chose not to file a complaint.

Mr. Massarella was in need of nursing care. He did not have financial resources and also had many debts and problems with Medicare and with creditors. Respondent consulted with a friend of Mr. Massarella and had him examined by a doctor to determine if he was competent, which he was. It was thereafter agreed by Mr. Massarella and his friend that Massarella would enter a nursing home and that his home would be sold to pay his debts and expenses. With the consent of Mr. Massarella's friend, respondent was retained to oversee all of Mr. Massarella's needs, arrange for the sale of his home, for his placement in a nursing home, and to make provisions to pay his bills and oversee his finances. Massarella was admitted as a private-paying patient of the nursing home on August 10, 1976, and was accepted as a Medicaid patient on October 14, 1976.

The Massarella home was sold on June 1, 1977. Of the $19,-526.72 net sale price, $12,075.72 was placed in a trust savings account for Massarella. Respondent retained the balance of approximately $7,500 as his legal fee.

When a representative of the Ocean County Board of Social Services (Welfare Board or agency) visited Massarella at the nursing home on September 7, 1977, Massarella reported that he had sold his home for a gross amount of $22,900, and complained that he did not know what had happened to this money. Medicaid benefits for Massarella were terminated on December 31, 1977, because respondent failed to supply information regarding the sale of the home. These benefits were restored on April 6, 1978. The welfare investigation was never completed because respondent did not submit the requested information (which failure respondent attributed to his physical incapacities, see *infra* at 157-59). Respondent did present to the agency a list of six payments totalling over $4,000, which he said had been paid to the nursing home in late 1977 and 1978. Nursing home records, however, revealed that those payments were made before June 1977, prior to the sale of the Massarella home. Respondent claimed before the Committee that the nursing home payments were originally made by Massarella's friend since the home would not accept Massarella without some established mode of payment. Massarella's friend was later reimbursed by respondent in cash. He had no receipt for the payments. This friend was deceased at the time of the hearing. Respondent stated that bank deposit slips or other backup material had been destroyed some years prior to the ethics proceedings. The Committee was also informed that due to insufficient information, the Welfare Board could not reach a conclusion regarding improprieties in connection with the sale of the house. Respondent told the Board that he had mistakenly believed that no formal accounting was required and did not obtain receipts. He maintained that the $12,000 balance from the house sale and savings account interest had been used on behalf of Massarella. Respondent reached an

agreement with the Attorney General's office to reimburse Medicaid. He informed the Committee that he agreed to this settlement because there were several suits pending for reimbursement and he did not want to go to trial. The amount of reimbursement was $10,000 with no interest over a fifteen-month period.

Respondent maintained that the approximately $7,500 fee he had charged was to cover whatever legal work was necessary for Massarella for the rest of his life. He acknowledged that he did not anticipate that there would be much more legal work, but maintained that this fee covered past and future work. This included administering the estate of Massarella's wife, investigating Masarella's financial situation, paying his bills, preparing a trust agreement, and when Medicaid was disallowed, preparing the necessary legal papers to enjoin that action. Respondent had not kept time records for services rendered.

Respondent, at the ethics hearing, was not able to explain deposits of $11,375 in the Massarella savings account, but was "of the conclusive belief they did not belong" to Massarella. Respondent explained that he had been hospitalized or bedridden at various times, had conducted most of his practice from home, and did not have exclusive control of the savings book. Respondent denied using the house proceeds for his own purposes.

At the Board hearing, the ethics committee presenter stated that

> we cannot prove by clear and convincing evidence any defalcation of any funds because we don't know where they went and what happened. We only know that he took them out.

The Committee concluded that respondent's representation of Massarella was a "complete failure." It found that respondent overreached in the collection of his fees, failed to keep accurate trust records, and did not behave in a manner that comports with the Rules of Professional Conduct or Disciplinary Rules. It believed some of respondent's actions were due to alcoholism

and that this should be considered in mitigation of those offenses. However, it noted that a substantial portion of the charges were alleged to have occurred after respondent ceased consuming alcohol. The Board agreed essentially with these findings.

The failure of respondent to have kept careful records so that he could provide an adequate and accurate accounting of his stewardships of his client's affairs is particularly egregious in these circumstances. We are satisfied by clear and convincing evidence that the findings of the Committee and the DRB are supported by the record, and that respondent's handling of Mr. Massarella's affairs, particularly in view of his client's advanced age, precarious health, and great dependency, amounted to gross neglect contrary to Disciplinary Rule 6-101. We also conclude that respondent's several ethics violations demonstrate a lack of fitness to practice law contrary to Disciplinary Rule 1-102(A)(6).

## II.

In imposing discipline we are admonished to consider any mitigating factors and to balance these against the nature of the ethics violations. Such evidence appears in this case.

Respondent claims that he had suffered a severe debilitating medical condition known as Reiter's Syndrome, which is characterized by arthritis and psoriasis. Respondent said he developed this physical condition during the spring of 1977. He sought medical assistance for his illness, but was not diagnosed as having Reiter's Syndrome until January 1978. Respondent stated that this physical condition severely affected his life. He was terrified, thinking that he would never walk again. At one point, he believed he had cancer and was dying. This condition affected his practice. He spent no more than 10% of his time in his office between October 1977 and January 1980. Respondent was certified as totally disabled by his disability carrier. He acknowledged that his record keeping at that time was "terrible," but this was not a material concern to him then.

During this same time, respondent also had a problem with alcohol. He said that between his illness and not being able to walk, he began to consume more alcohol, over a quart of whiskey a day. Respondent said that his heavy inbibing of alcohol affected his entire judgment, resulting in his life becoming unmanageable. Respondent first sought medical help for his alcohol problem in late 1978 or early 1979 from a private physician. He entered an inpatient alcohol rehabilitation program in October 1979. On November 15, 1979, he left that center, but began drinking again about December 15, 1979. He entered another rehabilitation program on December 29, 1979. He then participated regularly in Alcoholics Anonymous and underwent psychotherapy. He has not had any alcohol since December 29, 1979.

Roger G. White, an alcoholism counselor, testified before the ethics committee that he believed respondent was an alcoholic for about six years before he sought treatment. Dr. Bruce A. Loria, a licensed marriage and family therapist, first saw respondent in March 1980. He stated that as respondent progressively became healthier, Barbour was able to empathize with others and to move into a professional training program that he conducted.

Respondent also was examined by Dr. Robert L. Sadoff, a board certified psychiatrist, at the request of the OAE. In his report, Dr. Sadoff noted that respondent freely admitted that he did not keep good records or books when he was ill between 1977 and 1979. Respondent believed that he did not do anything wrong regarding the Massarella matter, but acknowledged he did not keep good records because of his alcoholism.[1] In the doctor's opinion, respondent is an alcoholic currently in partial remission. The doctor added that he was not in a

---

[1]Respondent also told Dr. Sadoff that he believed poor judgment rather than alcoholism was responsible for his conduct involving Barry Lamb, a different client. In 1977, Lamb had asked respondent to represent him in the purchase

position to state the actual relationship between respondent's alcoholism and the complaints against him, but acknowledged "that an alcoholic would have difficulty keeping accurate records and would have difficulty in using good judgment."

This evidence of mitigating factors is set forth because it is not genuinely disputed. Its impact upon appropriate discipline is relevant and should be considered.

## III.

Upon a review of the full record, the Board was satisfied that the conclusions of the ethics committee in finding respondent guilty of unethical conduct were fully supported by clear and convincing evidence. As observed by the Board, the record reveals a disturbing deterioration of respondent's legal efforts on behalf of his clients; a pattern of negligence clearly emerges. In the Matthews, Kratzer, and Massarella matters, respondent neglected to perform, or failed to perform in a timely manner, many required legal services. In these matters, respondent's conduct was seriously neglectful.

We are satisfied, as was the DRB, that the gravity of this negligence violated Disciplinary Rules 6-101(A)(1) and (2), and that in failing diligently to seek the lawful objectives of his clients, he also violated Disciplinary Rule 7-101(A)(1). We also conclude that his conduct adversely reflected on his fitness to practice law under Disciplinary Rule 1-102(A)(6). Further, the

---

of a bakery for $120,000. He told respondent that he could raise only $4,000, but needed $12,000 for the down payment. Lamb asked respondent if he would be willing to invest some money in the business. Respondent initially declined, but later agreed to invest as much as $8,000. Respondent borrowed the money from Kestitus Mikaitis, a client and friend, and deposited those funds in his trust account. At the ethics proceedings, respondent maintained he placed the money in his trust account because he did not know, at the time, how much he would need. The business venture was short-lived. Respondent reminded Lamb that the $8,000 had been a loan, which had to be returned. Respondent received the money from Lamb, which he repaid to Mikaitis. Based on the testimony, the Ethics Committee concluded that there had been no misappropriation of funds by respondent.

record demonstrates that he did not maintain sufficient records to comply with *Rule* 1:21–6, contrary to Disciplinary Rule 9–102(C), also adversely reflecting on his fitness to practice law, contrary to Disciplinary Rule 1–102(A)(6). We conclude further that the fees respondent charged in the Massarella and Matthews matters, particularly the additional $16,667 fee charged in the Matthews matter, were unreasonable and constituted overreaching, contrary to Disciplinary Rule 2–106(D).

The tribunals below did not accord mitigation evidence great weight. This is understandable. There was no testimony or proffer of evidence of this mitigation during the ethics hearing concerning the Matthews complaint. Indeed, the onset of respondent's medical illness together with alcoholism occurred long after respondent had commenced to represent the estate. However, respondent was in the throes of disability in the concluding year of his handling of the estate. These mitigating circumstances were only briefly mentioned by respondent in the Kratzer ethics hearing. In connection with this matter, respondent testified that he had been totally disabled for insurance purposes between 1977 and 1980 as a result of Reiter's Syndrome. He maintained that he was unable to walk for a three-month period and had gone to his office on an irregular basis during much of that time. He was bedridden for about six weeks. Nevertheless, in response to a question by the committee whether this condition should be taken into consideration regarding this ethics proceeding, respondent replied that it should not. As regards to the Massarella matter, respondent also stated, based on his attempted reconstruction of the file, that he did not know the nature and quality of his actions regarding the handling of the funds involved.[2]

We are satisfied that respondent's professional capacity and ability were seriously detrimentally affected by his disability, which was exacerbated by alcoholism. As Dr. Sadoff observed:

---

[2]Respondent made a similar statement regarding his understanding of the nature and quality of his acts in the Lamb matter. *Supra* at 158–159 n. 1.

There is no question, from review of the records and from my examination of Mr. Barbour, that he was significantly impaired by his alcoholism and by his Reiter's syndrome during 1977 and 1979. He was not functioning as effectively as he would without the alcohol intake and until his Reiter's syndrome came under better control.

This strongly suggests that some weight be accorded these mitigating factors.

The purpose of discipline is not to punish the offender, but is to protect the public from the attorney who does not meet the standards of responsibility of his profession. *In re Goldstaub*, 90 *N.J.* 1, 5 (1982). Mitigating factors are relevant in determining whether the public interest requires the extended suspension from the practice of law or the ultimate sanction of disbarment. Extenuating circumstances may demonstrate there is little or no likelihood that the attorney will repeat the transgressions. *See In re Mirabelli*, 79 *N.J.* 597, 602 (1979).

Respondent's "transgressions reflect on the competency and integrity of the entire Bar." *In re Barry*, 90 *N.J.* 286, 291 (1982). "The severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circumstances." *In re Nigohosian*, 88 *N.J.* 308, 315 (1982). In assessing the aggravating and mitigating factors, we should also evaluate "respondent's character and the likelihood that he will engage in similar activities in the future." *In re Sears*, 71 *N.J.* 175, 200 (1976). We also consider "whether in the totality of these circumstances, respondent has demonstrated that his ethical deficiencies are intractable and irremediable." *Matter of Templeton*, 99 *N.J.* 365, 376 (1985).

We are satisfied that the gravamen of respondent's ethics breaches consists not of dishonesty, duplicity, greed, or venality; they do not touch upon the proper administration of justice. Respondent's failures consist of neglect, inattentiveness, unresponsiveness, noncooperation, and delay. They were occasioned by a lack of good judgment and a loss of will and initiative. Respondent's poor performance and breach of ethics

in some measure were influenced by his serious medical illness exacerbated by his alcoholism. Even though he earlier professed to discount these mitigating factors as irrelevant, he now conscientiously urges our full and sympathetic consideration of them. The nature and extent of these conditions, however, do not excuse or exonerate respondent for serious and continuing ethics failures.

■■ We are particularly impressed that respondent indisputably suffered a grave medical disorder. We do not believe this condition would excuse dishonesty or misappropriation. *See In re Jacob,* 95 *N.J.* 132 (1984). Similarly, his alcoholism, standing alone, would not serve to mitigate any ethics breaches involving dishonesty or misappropriation. *Matter of Gilliam,* 106 *N.J.* 537 (1987); *Matter of Crowley,* 105 *N.J.* 89 (1987). Such a condition, however, may serve to explain ethics breaches involving inadequate professional performance. *See Matter of Simeone,* 108 *N.J.* 515 (1987); *Matter of Noonan,* 102 *N.J.* 157 (1986). While alcoholism as such will rarely excuse any ethics transgressions, the exacerbation of his physical disease by alcoholism can be relevant in assessing ethical guilt.

■ The combination of these conditions will not exonerate respondent in this case. At the very least, respondent should have reached out for help and sought the assistance of outside counsel or referred these matters to another attorney. Nevertheless, in our judgment, his illness coupled with alcoholism in these circumstances blunts the blameworthiness of the misconduct.

We are also mindful that the events underlying respondent's ethical transgressions occurred almost ten years ago. Respondent has, apparently, rehabilitated himself. As noted by Dr. Loria concerning respondent's future abuse of alcohol,

> I would say there is a less that .005 percent chance of him ever doing that to himself again, no chance, and because he's seen how life can be awfully bad and unsatisfying while trying to solve problems with alcohol.

In view of these circumstances and the substantial mitigating evidence, we determine that respondent be suspended for a

period of six months.  Respondent shall reimburse the Ethics Financial Committee for administrative costs, including the preparation of transcripts.

## ORDER

It is ORDERED that RICHARD L. BARBOUR of TOMS RIVER, who was admitted to the bar of this State in 1970, be suspended from the practice of law for a period of six months, effective February 1, 1988, and until the further order of this Court;  and it is further

ORDERED that RICHARD L. BARBOUR be restrained and enjoined from practicing law during the period of his suspension;  and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs including the preparation of transcripts;  and it is further

ORDERED that respondent comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.