599 A.2d 1275

IN THE MATTER OF JUDGE DONALD G. COLLESTER, JR., A JUDGE OF THE SUPERIOR COURT.

Submitted November 4, 1991—Decided January 10, 1992.

*Patrick J. Monahan, Jr.,* Counsel, for the Advisory Committee on Judicial Conduct.

*Stephen S. Weinstein* submitted a letter in lieu of brief on behalf of respondent.

PER CURIAM.

This case involves judicial misconduct. The matter was initially presented to the Advisory Committee on Judicial Conduct (Committee or ACJC) on a formal complaint against the respondent, Donald G. Collester, Judge of the Superior Court. The complaint charged that respondent had violated several Canons of the Code of Judicial Conduct as well as Rules of Court. The misconduct involved respondent's operation of his automobile on April 28, 1991, resulting in charges for violating *N.J.S.A.* 39:4–50, operating a automobile while intoxicated, *N.J.S.A.* 39:4–98, driving in excess of the speed limit, and *N.J.S.A.* 39:4–86, improperly passing another vehicle. Respondent filed an answer admitting the factual allegations of the complaint.

The Committee held a formal hearing on the charges, in which it considered respondent's convictions for the motor vehicle offenses, in addition to other testimonial and documen-

tary evidence. It then filed a presentment with this Court containing its findings and conclusions and recommended discipline. Respondent voluntarily waived oral argument in the matter and agreed to abide by this Court's decision, including appropriate discipline.

I

The essential facts are not in dispute. The Committee determined that the evidence clearly and convincingly demonstrated the following:

On the night of Saturday, April 27, 1991, respondent drank heavily at a social occasion. He continued to drink into the early morning hours and fell asleep at home in his chair. The following morning, he awoke and proceeded to drive to the Sussex County Court House in Newton to obtain a file in a case that he was scheduled to try the following day. His plan was to bring the file home and look it over that Sunday night.

As respondent was driving in a northerly direction on State Highway 206 in Andover Township at approximately 9:55 a.m. on Sunday, April 28, he was observed by an officer of the New Jersey State Police who was operating a patrol car in a southerly direction on that highway. The trooper clocked respondent's vehicle on radar as traveling at 65 miles per hour in a 50 m.p.h. zone. The trooper performed a U-turn and began to pursue respondent's vehicle as it proceeded north on Highway 206. During the pursuit, the trooper observed respondent passing another vehicle in a no-passing zone. The trooper then accelerated and conducted a speedometer pace of respondent's vehicle and measured respondent's speed at 78 miles per hour. The trooper turned on his overhead lights and then activated his siren. At that point, respondent pulled over to the right shoulder and stopped so suddenly that the trooper had to drive in front of him and then back up to him on the shoulder.

When the trooper asked respondent for his driving credentials, respondent told the trooper that he was a Superior Court Judge and that he was on his way to the court house on an emergency. Respondent repeated this statement as the trooper was administering field sobriety tests on the shoulder of the road. Respondent cooperated in performing those tests, and the trooper concluded from the results of the tests that respondent was under the influence of alcohol. The trooper told respondent that he was under arrest and that he had to be handcuffed. Although respondent initially pulled away as the trooper reached for his wrist to handcuff him, he then submitted to being handcuffed. The trooper transported respondent to the Sussex Station of the New Jersey State Police, where breathalyzer tests were administered and respondent's blood alcohol content was measured at .16% and .17%.

Respondent was charged with driving while under the influence of alcohol in violation of *N.J.S.A.* 39:4–50, speeding in violation

of *N.J.S.A.* 39:4-98, and improper passing in violation of
*N.J.S.A.* 39:4-86. On May 30, 1991, he appeared in the Andover
Township Municipal Court and entered pleas of guilty to the
charges of driving while under the influence and speeding (into
which the charge of improper passing was merged). The
municipal court ordered respondent to pay a fine of $80 on the
speeding charge, and on the DWI conviction sentenced respon-
dent to a fine of $500, to perform thirty days of community
service, to forfeit his driving privileges for two years, and to
serve forty-eight hours of confinement. The court found that
the requirement of confinement had been satisfied by respon-
dent's stay at an inpatient rehabilitation program from April 28
to May 26, 1991. The court also ordered that respondent
satisfy the requirements of the Intoxicated Driver Resource
Center, assessing a payment of $100 to the Drunk Driving
Enforcement Fund, ordered payment of $30 to the Violent
Crimes Compensation Board, and assessed an ATS surcharge of
$2.00 and court costs of $50. Respondent paid the fines and
other charges, and he subsequently performed thirty days of
community service working as a gardener at a home for the
elderly.

The Committee concluded that respondent had violated sever-
al Canons of the Code of Judicial Conduct, namely, Canon 1,
which requires a judge to observe high standards of conduct so
that the integrity and independence of the judiciary may be
preserved; Canon 2A, which requires a judge to respect and
comply with the law and to act at all times in a manner that
promotes public confidence in the integrity and impartiality of
the judiciary; and Canon 2B, which prohibits a judge from
using the prestige of his or her office to advance private
interests. The Committee further found that respondent had
engaged in conduct prejudicial to the administration of justice
that brought the judicial office into disrepute, in violation of
*Rule* 2:15-8(a)(6). It recommended that respondent be cen-
sured and that he be disqualified from presiding over any cases
involving substance abuse until his Assignment Judge is satis-

fied that his rehabilitation is secure. The Committee also recommended that respondent be required to continue his active participation in rehabilitative programs and that his progress in such programs be monitored by the Assignment Judge.

## II

In attorney and judicial disciplinary cases, the Court gives conclusive effect to the respondent's convictions of statutory crimes and offenses. *R.* 1:20–6(c)(1). *E.g., In re Conway,* 107 *N.J.* 168, 526 *A.*2d 658 (1987); *In re Coruzzi,* 98 *N.J.* 77, 484 *A.*2d 667 (1984). In this case, respondent's conviction established his violations of the motor-vehicle laws. We are impelled to accept those convictions as determinative of respondent's guilt of the underlying offenses. *In re Connor,* 124 *N.J.* 18, 589 *A.*2d 1347 (1991). As determined by the Committee, the convictions establish by clear and convincing evidence respondent's misconduct in violation of Canons 1, 2A, and 2B, and *Rule* 2:15–8(a)(6).

Although in disciplinary proceedings a conviction is dispositive in establishing the occurrence of unethical conduct, the assessment of discipline entails a more searching and expansive inquiry. We thus carefully scrutinize the substantive offenses that constitute the core of respondent's misconduct, the underlying facts, and the surrounding circumstances in determining the nature and extent of discipline. *In re Connor, supra,* 124 *N.J.* at 22, 589 *A.*2d 1347; *In re Pleva,* 106 *N.J.* 637, 525 *A.*2d 1104 (1987); *In re Coruzzi, supra.*

With respect of drunk driving, we said in *Connor:* "We do not view offenses arising from the driving of an automobile while intoxicated with benign indulgence. They are serious and deeply affect the safety and welfare of the public. *E.g., State v. Schreiber,* 122 *N.J.* 579, 585 *A.*2d 945 (1991); *State v. Hamm,* 121 *N.J.* 109, 577 *A.*2d 1259 (1990); *State v. Downie,* 117 *N.J.* 450, 569 *A.*2d 242 (1990); *State v. Tischio,* 107 *N.J.* 504, 527 *A.*2d 388 (1987). They are not victimless offenses."

124 *N.J.* at 21, 589 *A.*2d at 1349. We firmly endorse the governmental commitment to the eradication of drunk driving as one of the judiciary's own highest priorities.

Respondent is a repeat DWI offender. His DWI conviction in this matter is his second. On October 17, 1987, respondent was charged with driving while intoxicated, and he subsequently entered a plea of guilty to that charge and was duly sentenced. As a result, a formal complaint was filed with the ACJC, charging respondent with judicial misconduct. Respondent assured the Committee that what had occurred was an isolated incident, that he did not have a chronic problem of alcohol abuse, and that there would be no repetition of that conduct. The Committee issued a private reprimand.

■ Respondent admits that he is, and has been, an alcoholic. This condition has caused respondent to become a repeat drunk driving offender. Even though acutely mindful of respondent's alcoholism, the Committee, nevertheless, stressed, "it is respondent's conduct that must be considered, and its effect on the public's perception of the integrity of the judiciary. That conduct violated the law and brought his judicial office into disrepute." We agree that the focus for appropriate discipline must be primarily fixed on respondent's conduct. Sympathy for one in the grip of alcoholism cannot negate the serious consequences of ensuing misconduct. Hence, we cannot view respondent with the same lenity that may have been appropriate in his first disciplinary case.

Without doubt the most egregious aspect of respondent's ethical dereliction is the fact that he has repeated the offense of drunk driving. However, in addition to that circumstance, there were other aggravating circumstances surrounding his motor vehicle infractions. Respondent, on his arrest, immediately informed the arresting officer that he was a Judge of the Superior Court. He also stated that he was responding to an emergency at the court house. That statement was false. There was no emergency. Although respondent was, in fact,

proceeding to the court house, it was to obtain a file to review that night in preparation for the next day's trial. Moreover, he repeated that false statement to the arresting trooper. He thus seemingly attempted to divert, if not obstruct, justice. Further, as observed by the Committee, "respondent's several references to his judicial status gave the impression that he was entitled to some special preference." He thus clearly used the prestige and weight of his judicial office to try to gain some personal advantage.

The Committee believed that under the circumstances more severe discipline than a reprimand is required. The majority of the Committee concluded that a censure should be imposed. The Committee opined that because of surrounding circumstances the respondent's misconduct in the *Connor* matter was arguably more serious than respondent's conduct in the present matter. However, it believed that because respondent's misconduct here involved a second DWI offense, that circumstance constituted an aggravating factor of similar gravity, and therefore respondent's misconduct warranted the same level of discipline, namely, a censure.

Some members of the Committee believed that stricter discipline, suspension, was called for. The majority, however, resisted recommending the imposition of greater discipline. It felt that more severe discipline was not warranted because (1) respondent's conduct did not cause harm to others and did not affect the performance of his judicial duties, (2) there is no credible evidence that respondent ever performed judicial duties while under the influence of alcohol, and (3) respondent has an excellent reputation as an industrious, capable jurist. The Committee noted particularly respondent's realization of his alcohol problem:

Respondent was shaken by the incident, in his own words, he was "totally, utterly, completely shocked and devastated." His arrest brought home to him for the first time the fact that he needed help. Consequently, even before leaving the state police barracks, he called an attorney whom he knew to be a recovering alcoholic and sought his help. That person immediately made arrangements for respondent to enter an inpatient rehabilitation program, and

later that same day, drove complainant to the rehabilitation facility. Respondent remained there as an inpatient from April 28 to May 26, 1991. He then entered a continuing care program, on an outpatient basis at another facility. In addition, he began to and continues to attend daily meetings of Alcoholics Anonymous.

We fully recognize the relevance of those mitigating circumstances—respondent's sincere confrontation with his alcoholism and commitment to rehabilitation, his remorse, and his exemplary personal and professional reputation. But they do not warrant the measure of discipline recommended by the Committee.

We noted in *Connor* other judicial disciplinary cases, including this respondent's earlier case, in which a private or public reprimand was deemed appropriate discipline for misconduct involving drunk driving. In most of those cases, the respondents had no prior record of drunk driving or other professional misconduct, they enjoyed professional and judicial reputations of excellence, and most importantly, they were sincerely committed to overcoming the disease of alcoholism and achieving recovery. 124 *N.J.* at 27, 589 *A.*2d 1347. While noting those factors, we ordered that the respondent be censured to reflect the more egregious nature of the underlying misconduct attributable to the circumstances surrounding his infractions. *Ibid.* We characterized censure as a harsher sanction than a reprimand, one that stands in order of severity between a reprimand and formal suspension from judicial office. *Id.* at 27–28, 589 *A.*2d 1347. We declined under the circumstances to impose more severe discipline.

In this case we cannot equate respondent's situation to that of the respondent in *Connor.* The salient distinguishing factor is that respondent's breach involves a second violation of the laws proscribing drunk driving. We accept the fact that the root of defendant's misconduct is alcoholism, a dreadful and ruinous disease. *See, e.g., Clowes v. Terminix Intern., Inc.,* 109 *N.J.* 575, 594, 538 *A.*2d 794 (1988). We in no way consider this disability and its treatment as a "vice." *Post* at 477, 599

*A*.2d 1275 (Pollock, J., concurring in part and dissenting in part). We do not fault alcoholics for failing to cure their condition. But an individual's failure to confront and neutralize the effects of such a condition, when evidenced in part by repeat offenses, in a judge comes perilously close to demonstrating unfitness to hold judicial office.

We are not prepared to conclude that because respondent is an alcoholic whose condition has led him to a second drunk driving offense, he is unfit to be a judge. Indeed he has apparently succeeded in walling off his alcoholism from the actual performance of his regular judicial duties, reflected in his reputation for judicial excellence. More importantly, he is now aggressively confronting and combatting his alcoholism.

Nevertheless, respondent's misconduct must seriously shake public confidence in the judiciary, and, unless bolstered by a prompt and appropriate disciplinary response, that confidence is bound further to weaken and erode. That response must be in the nature of a suspension from office. Although such discipline obviously will hurt the respondent personally and professionally, it will also wound the judiciary, which can ill-afford the loss, even temporarily, of an effective and worthy judge. Unfortunately, we cannot withhold proper discipline because the judiciary will also suffer.

## III

The evidence clearly and convincingly demonstrates that respondent engaged in serious ethical infractions, involving most particularly, his commission of a second offense for driving while intoxicated. We conclude that respondent's misconduct violates Canons 1, 2A and 2B of the Code of Judicial Conduct and *Rule* 2:15–8(a)(6).

Accordingly, we determine that respondent shall be suspended from the performance of his judicial duties for a period of two months and shall forfeit his salary during that period. We further impose additional sanctions: respondent shall be re-

quired to continue to participate actively in rehabilitative programs, and shall be disqualified from presiding over any cases involving drunk driving until his rehabilitation becomes secure.

So ordered.

POLLOCK, J., concurring in part and dissenting in part.

Respondent pled guilty to the charges of driving under the influence, *N.J.S.A.* 39:4–50, and speeding, *N.J.S.A.* 39:4–98. The majority concludes that respondent's misconduct "must seriously shake public confidence in the judiciary," *ante* at 476, 599 *A.*2d 1275, and that a two-month suspension is necessary to prevent further damage to public confidence. It bases its conclusion on the facts that this is respondent's second conviction for driving while under the influence of alcohol, *ibid.*, and that respondent falsely stated to the arresting officer that he was on an emergency trip to the Sussex County Courthouse, *ante* at 473, 599 *A.*2d 1275. I agree with the majority that respondent's misconduct requires discipline stronger than the censure recommended by the Advisory Committee on Judicial Conduct. I write separately not because the Court fails to find a tolerable accommodation of the relevant interests, but because I believe it could find a more serviceable one. The Court would better serve the public interest by staying the suspension if Judge Collester would agree to continue to serve as a judge without salary for two months. Foregoing approximately $16,-500 in pay is more than a slap on the wrist. All that is gained by a suspension is condemnation of a judge because of his alcoholism and his conduct while under its influence.

–I–

With one exception, I agree with substantially all of the majority's opinion. Although the exception is narrow, it highlights a difference of opinion about alcoholism and the appropriate response to a judge who violates the Code of Judicial

Conduct because of that disease. That respondent has violated the Code is beyond doubt. Equally clear is that his alcoholism directly caused the violation. The majority acknowledges that alcoholism is "a dreadful and ruinous disease." To this extent, the majority treats alcoholism as a mitigating factor. The majority also states that the "failure to confront and neutralize the effects of such a condition, when evidenced in part by repeat offenses, in a judge comes perilously close to demonstrating unfitness to hold judicial office." *Id.* at 476, 599 *A.*2d 1275. Missing from the majority's description is the recognition that one characteristic symptom of alcoholism is the alcoholic's denial of the existence of the disease. In denying to themselves and to others that they are so afflicted, alcoholic judges are no different from other alcoholics.

Respondent is not an alcoholic because he wants to be one. A member of a family with a history of alcoholism, he testified before the Advisory Committee on Judicial Conduct how he had hidden from his alcoholism before this incident:

> I thought I could control my drinking previously, sir. And one of the insidious things about this disease is that sometimes you feel you can. I was able to control it from the standpoint of I never—I never drank, you know, during the weeks that would affect my work, so I was able to feel, "Well, I don't do that therefore I'm not alcoholic. I can control the drinking."
>
> I rarely drank in public so I felt, "Well, if I don't have to do that, you know, I'm obviously not an alcoholic. I could control it." I didn't get intoxicated every time I drank and I felt, "Well, if that's the case, I can control it. I'm not an alcoholic."
>
> It's an insidious disease. I was wrong. I am an alcoholic.

By recognizing his problem and seeking treatment for it, respondent has taken the first step in his recovery.

Respondent's testimony that his alcoholism never affected the discharge of his judicial duties is corroborated by uncontradicted letters from attorneys, law clerks, other court personnel, and members of the public. The Morris, Passaic, and Sussex County Bar Associations and the Criminal Practice Committee of the Morris County Bar Association adopted resolutions confirming that respondent "has never been under the influence of any intoxicant or in any way unable to perform his judicial

duties during regular court hours or after hours when called upon to act in a judicial capacity." Joseph Miele, chairman of the Governor's Council on Alcoholism and Drug Abuse, wrote:

> I respectfully suggest that no useful purpose would be served at this time by suspending or dismissing Judge Collester who has already paid a very dear price for his indiscretions. On the contrary, I respectfully suggest that it would be more useful not only for Judge Collester, but for the public at large, to receive the continuing benefit of his services as a Judge of the Superior Court of New Jersey.

James O'Brien, chairman of the Coalition of Crime Victims' Rights Organizations of New Jersey, who observed respondent preside over four capital cases, including one in which Mr. O'Brien's daughter was the victim, wrote:

> I believe that one of the greatest compliments that can be given to a Jurist can be bestowed without reservation on Judge Collester. It is the fact that after all 4 trials had been concluded the victims and the survivors in each case told me that Judge Collester had restored their faith in the criminal, and judicial system, and had recognized that there was both a victim and a survivor who were human beings who had suffered. I believe that it was best stated when the mother of a murdered young man said to me, "Without compromising the rights of the defendant he gave back to me the dignity I had taken away through the criminal justice system."

These resolutions and letters comport with this Court's independent determination that respondent's alcoholism has never affected his judicial performance. Indeed, in the seven months since he completed in-patient treatment, respondent has been ably discharging his duties as a Superior Court judge. This is not a case in which suspension is required because of a judge's inability to perform.

–II–

The Legislature has responded to the medical and social characterization of alcoholism as a disease and not a vice. The declared public policy of this State is to afford alcoholics treatment that will enable them to "lead normal lives as productive members of society." *N.J.S.A.* 26:2B–7. Health insurance policies in New Jersey must provide coverage for the treatment of alcoholism "to the same extent as for any other sickness." See *N.J.S.A.* 17:48–6a; *N.J.S.A.* 17:48A–7a; *N.J.S.A.* 17:48E–34;

*N.J.S.A.* 17B:26–2.1; *N.J.S.A.* 17B:27–46.1. In fact, health insurance benefits for State employees specifically include coverage for the treatment of alcoholism. *N.J.S.A.* 52:14–17.29(B). Persons treated for alcoholism may not be deprived of their civil rights and privileges based on being alcoholics. *N.J.S.A.* 26:2B–21. Our Law Against Discrimination, *N.J.S.A.* 10:5–1 to –38, considers alcoholism to be a disability, *see Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 593–95, 538 *A.*2d 794 (1988), as does section 3 of the Americans With Disabilities Act of 1990, 42 *U.S.C.A.* § 12102, *see* H.R.Rep. No. 101–485(II), 101st Cong., 2d Sess. 51, *reprinted in* 1990 *U.S.Code Cong. & Admin.News,* 303, 333. Medical records relating to treatment for substance abuse are protected by strict federal rules of confidentiality, backed by criminal penalties for violation, to ensure that a patient in an alcohol or drug abuse program "is not made more vulnerable by reason of the availability of his or her patient record than an individual who has an alcohol or drug problem and who does not seek treatment." 42 *C.F.R.* § 2.3(b)(2).

For other employees, this Court has recognized that alcoholism is a disease. In *Clowes v. Terminix International,* we observed that the medical community has so characterized alcoholism for thirty-five years. 109 *N.J.* at 592–93, 538 *A.*2d 794. In the attorney-disciplinary context, we have considered alcoholism as a mitigating factor in cases of ethical violations not involving dishonesty or prejudice to the administration of justice. See *In re Barbour,* 109 *N.J.* 143, 161–62, 536 *A.*2d 214 (1988). In another judicial-disciplinary case involving drunk-driving and alcoholism, we recognized as mitigating factors a respondent's confrontation of his alcoholism and his commitment to rehabilitation. *In re Connor,* 124 *N.J.* 18, 26, 589 *A.*2d 1347 (1991). Through the Judicial Advisory Service, a partnership between the judiciary and the Robert Wood Johnson School of Medicine, judges may receive confidential counseling on alcohol abuse.

In its capacity as an employer, the State, like other enlightened employers, treats alcoholism as a disease. The standard health insurance policy that covers judges provides for payment of the cost of in-patient treatment, such as that received by respondent. To the extent that it ignores the implications of treating alcoholism as a disease, the Court adopts a position that conflicts with the established judicial response in other settings.

## –III–

Respondent pled guilty to the charges of driving while intoxicated and speeding. These offenses, particularly the DWI offense, respondent's second, are serious. They called for stiff penalties, which the municipal court imposed: fines totaling $580, thirty days of community service, a two-year suspension of driving privileges, forty-eight hours of confinement, and $182 in assessments and costs. He will also be subject to insurance surcharges of $1000 per year for three years when his driving privileges have been restored. *N.J.S.A.* 17:29A–35(b)(2).

Respondent satisfied the community service component of his sentence by helping with a major landscaping project at a home for senior citizens. As described by the director of that home, the work "involved a lot of back-breaking labor, filth, mud, sweat, and rain," working alongside "people he had sentenced."

These substantial penalties and fees reflect the seriousness of drunk driving and the need to punish offenders. Their imposition vindicates society's interest in enforcement of the motor vehicle laws. Respondent, who has been treated no differently from any other citizen convicted of motor vehicle violations, has paid the price for his offenses.

The purpose of this disciplinary proceeding is not to increase the punitive force of the sentence on respondent's motor vehicle violations or to humiliate him further. Rather, this Court's function is to evaluate respondent's fitness as a judge and to

preserve the integrity of, and public confidence in, the judicial system. Respondent's reputation as an "industrious, capable jurist," *ante* at 474, 599 *A*.2d 1275, is beyond dispute. Nothing indicates that respondent's alcoholism impaired the discharge of his judicial duties. *Id.* at 475, 599 *A*.2d 1275.

Permitting respondent to serve without pay would vindicate the integrity of the judiciary as effectively as a suspension. Months have elapsed since respondent's offense. In the interim, he has received both in-patient and out-patient treatment and has resumed his judicial duties. In this context, a two-month suspension is more punitive than rehabilitative. Forfeiting respondent's pay for two months without suspending him from the performance of his duties would, in my opinion, satisfy the public's legitimate expectation that we will deal firmly with judges who violate the Code of Judicial Conduct, without depriving the public of the services of a judge whose qualifications have never been in doubt, who has capably discharged his responsibilities, and whom the judiciary can ill afford to lose for even two months.

*For suspension without pay*—Chief Justice WILENTZ and Justices HANDLER, O'HERN, GARIBALDI, and STEIN—5.

*Concurring in part; dissenting in part*—Justice POLLOCK—1.