910 A.2d 594

IN THE MATTER OF WILBUR H. MATHESIUS, A JUDGE
OF THE SUPERIOR COURT OF NEW JERSEY.

Argued September 25, 2006—Decided November 30, 2006.

*Patrick J. Monahan, Jr.*, argued the cause on behalf of the Advisory Committee on Judicial Conduct.

Arnold C. Lakind and *Wilbur H. Mathesius, pro se,* argued the cause for respondent (*Szaferman, Lakind, Blumstein, Blader & Lehmann, P.C.,* attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

Based in large measure on stipulated, admitted, or uncontested facts, the Advisory Committee on Judicial Conduct (Advisory Committee) filed a Presentment against Superior Court Judge Wilbur H. Mathesius. Tracking the allegations of the formal complaint originally filed against him, the Presentment found, by clear and convincing evidence, that Judge Mathesius had violated Canons 1, 2A, 3A(3), 3A(6), and 3A(10) of the *Code of Judicial Conduct* and *Rule* 2:15–8(a)(6), and recommended that Judge Mathesius be suspended for a period of six months, but that "only three months of his suspension be without pay." Upon receipt of the Presentment, Judge Mathesius was ordered to "show cause before this Court why he should not be publicly disciplined through the imposition of an appropriate sanction that does not include removal from judicial office[.]"

We conclude, as did the Advisory Committee, that Judge Mathesius's conduct, as charged and proved, violated several Canons of the *Code of Judicial Conduct.* Specifically, we find that, in the instances charged, Judge Mathesius failed to "personally observe[ ] high standards of conduct so that the integrity and independence of the judiciary may be preserved[,]" in violation of Canon 1; failed to "respect and comply with the law and . . . act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary[,]" in violation of Canon 2A; failed to "be patient, dignified, and courteous to . . . jurors . . . with whom the judge deals in an official capacity," in violation of Canon 3A(3); failed to "accord to every person who is legally interested in a proceeding, or that person's lawyer, full right to be heard according to law," in violation of Canon 3A(6); failed to refrain from "criticiz[ing] jurors for their verdict," in violation of Canon 3A(10); and engaged in "conduct prejudicial to the adminis-

tration of justice that brings the judicial office into disrepute[,]" in violation of *R.* 2:15–8(a)(6).

However, we reject the Advisory Committee's recommendation in respect of the appropriate quantum of discipline to be imposed. Rather, we hold that the appropriate measure of discipline is that Judge Mathesius be suspended from his judicial duties without pay for a period of thirty days.

## I.

## A.

▮ "[T]he people of New Jersey, in adopting our present Constitution, reposed in the New Jersey Supreme Court, a non-political entity, exclusive responsibility for the making of rules concerning practice and procedure in the courts thereby created...." *In re Gaulkin,* 69 *N.J.* 185, 189, 351 *A.*2d 740 (1976) (citation omitted). As *Gaulkin* further explains, "[t]he constitutional voice of the people thus vested in the Supreme Court a responsibility to keep the house of the law in order, and this responsibility obviously extended to the conduct of judges as well as attorneys in practice." *Ibid.* (citations and internal quotation marks omitted).

Complying with the constitutional mandate that "[t]he Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts[,]" *N.J. Const.* art. VI, § II, ¶ 3, this Court adopted *R.* 1:14. That *Rule* provides, in relevant part, that "the *Code of Judicial Conduct* of the American Bar Association, as amended and supplemented by the Supreme Court and included as an Appendix to Part I of these *Rules* ... shall govern the conduct of ... the judges ... of all courts in this State." *See generally In re Gaulkin, supra,* 69 *N.J.* at 192, 351 *A.*2d 740 ("[T]he American Bar Association Canons of Judicial Ethics ... were adopted by the first Supreme Court under the new court system by *R.* 1:7–6 (1948)."); *In re Nat'l Broad. Co.,* 64 *N.J.* 476, 479, 317 *A.*2d 695

(1974) ("The new *Code of Judicial Conduct* of the American Bar Association as amended by this Court is, coincidentally, adopted and promulgated this day to become effective immediately. It replaces the existing Canons of Judicial Ethics[.]"); *In re Mattera,* 34 *N.J.* 259, 263, 168 *A.*2d 38 (1961) (referencing parallel provisions in earlier Canons of Judicial Ethics and *R.R.* 1:25); *Perazzelli v. Perazzelli,* 147 *N.J.Super.* 53, 60, 370 *A.*2d 535 (Ch.Div. 1976) ("The comment to *R.* 1:18 states 'that . . . the reference to the Canons of Judicial Ethics should be read as *"Code of Judicial Conduct."* ' Pressler, *Current N.J. Court Rules,* Comment to *R.* 1:18.").

In the discharge of that responsibility, and "to assist otherwise in fulfilling the administrative responsibilities of the Court, the Court establishe[d] a committee of this Court to be known as [the] Advisory Committee on Judicial Conduct." *R.* 2:15–1. *See Am. Trial Lawyers Ass'n v. New Jersey Supreme Court,* 66 *N.J.* 258, 264, 330 *A.*2d 350 (1974) ("Nor has the judiciary forgotten to regulate the conduct of its own members, as by our adoption of the *Code of Judicial Conduct* and our creation of [the] Advisory Committee on Judicial Conduct to aid in its enforcement. *R.* 2:15–1, *et seq.*"). The Advisory Committee's duties are clearly delineated in our *Rules.* *See R.* 2:15–1 to –25 (providing for establishment, staffing, operations, jurisdiction and procedures of Advisory Committee on Judicial Conduct).

## B.

Judge Mathesius either stipulated to, admitted or did not contest the operative facts presented in the formal complaint or developed during the formal hearing. We, therefore, address the facts as they pertain to the charges in the formal complaint.

### 1. *Post-verdict comments to the jury in State v. McDaniels.*

In respect of Count One of the formal complaint, Judge Mathesius admitted that, on February 3, 2005, after the jury had returned a not guilty verdict in the matter styled *State v. McDan-*

*iels,* he made a series of inappropriate comments in the presence of or directly to the jury. Immediately after the jury acquitted the defendant and was polled, Judge Mathesius addressed the defendant as follows:

THE COURT: Mr. McDaniels, I ask you to stand.

You are, sir, a very, very, very lucky man. The evidence was very strong that you were guilty of this offense. *I don't know what they [the jurors] were thinking, but they're thinking other than what I was thinking.* You have a number of convictions and I'll tell you this: If you find yourself in trouble again, the resolution of the case [will be] other than the windfall you received today, do you understand how lucky you are, Mr. McDaniels? Do you understand that?

THE DEFENDANT: Yes.

. . . .

THE COURT: But for the fact that something happened with the other defendant and he got scared and didn't testify, that may have changed the jury's verdict. Mr. Williams' testimony was one of the most credible witnesses this Court has ever seen. I'm going to tell you, you have a girlfriend out there, you better look in the mirror tonight when you go home and say I dodged five years in jail by some God unknown occurrence. *12 people listened to the testimony and somehow didn't believe not only the direct testimony, but the circumstantial evidence* that you took the gun and shot it in the air, walked in front of Mr. Williams and walked out into the field and buried it or had Kafarr Logan bury it so that may be a change in your life, I hope it is, because if it's involved with gangs and drugs and any of the screwing around with guns or drugs or anything more, you're going to end up with your ass in jail. Do you understand? I don't want that to happen.

Now I want you to look and thank God, *get on your hands and knees tonight and thank God that this jury didn't see the forest for the trees.* Do you understand what I'm saying to you, sir?

[(emphasis supplied).]

Judge Mathesius next excused the jurors, but nonetheless ordered them to remain in the jury room. Judge Mathesius then entered the jury room admittedly "upset, and frustrated[.]" Three of the jurors in *McDaniels* testified at the formal hearing. One juror explained that

when the judge walked into the [jury] room, he walked in with a stride, like he had a purpose. Like he was there. He still had his robe on, he was there for a—to tell us. And you could tell that once he started talking, he expressed his—he expressed his frustration level to the [not guilty] verdict that we had given [the defendant]. . . .

Q. What did he say?

A. He asked us what the hell what we were thinking about.

Asked to describe Judge Mathesius's tone while delivering his peroration to the jury, the juror described it as "one of an underlying anger, but also of a frustration level." The juror explained that "he did, in the end, apologize for his behavior[and that h]e expressed that he was more or less venting, and just saying that he was speaking out of frustration, that he was sorry." The juror contrasted Judge Mathesius's behavior in the jury room with what the juror had observed during the court proceedings:

in the courtroom, it was understanding, it was authoritative in the sense that, you know, he was doing his job, in the manner in which he spoke. He clarified everything. When he came into the jury room, it was higher pitched, a little bit of anger in it, but also a frustration level, in which he did comment.

The juror explained that she "did not expect to be spoken to in the manner in which [she] was spoken to[,]" and that "it almost brought you back, like you were being screamed at, as a child, by your parents." Her view of Judge Mathesius's comments was stark: "I don't allow people in my personal life to speak to me like that, I just don't allow it." The other two jurors who testified before the Advisory Committee echoed those sentiments.[1] Judge Mathesius did not cross-examine any of the jurors who testified at the formal hearing.

The Advisory Committee concluded that Judge Mathesius's "post-verdict remarks, both those from the bench and those made in the jury room, were not only critical of the jurors for their

---

[1] The typewritten interviews of six jurors and four Sheriff's Officers, and the certifications of an additional six jurors in *State v. McDaniels* were introduced as evidence in the formal hearing before the Advisory Committee. Several of the accounts described in either the typewritten interviews or the certifications differ in several material respects from the testimony elicited from the three jurors who testified at the formal hearing. Indeed, the jury foreman certified that he did "not recall Judge Mathesius using any inappropriate language" when Judge Mathesius addressed the jury after the verdict and that he "would serve as a juror again before Judge Mathesius or any other judge." The jury foreman's views were repeated by other jurors. Notwithstanding those differences in the perceptions of the jurors, Judge Mathesius ultimately conceded that he "entered the jury room and criticized the jurors for their decision[,]" and that he "said to the jurors: 'What the hell were you thinking?'" He further admitted that his comments were "grossly inappropriate" and "absolutely" wrong.

verdict but were also insulting and denigrating of those who had responded to a call to public service and who had performed that service." The Advisory Committee thus concluded that Judge Mathesius's conduct violated Canons 1, 2A, and 3A(10) of the *Code of Judicial Conduct* and *R.* 2:15–8(a)(6).

2. *Jury contact during deliberations—State v. Byrd and Dean.*

In respect of Count Two of the formal complaint, Judge Mathesius admitted that, at approximately 4:00 p.m. on July 22, 2004, while a jury was deliberating in *State v. Byrd and Dean* and while unaccompanied by either counsel or a court reporter, he "entered the jury room to ask the jurors whether they wished to continue deliberating that day or to go home and return in the morning." [2] Judge Mathesius also admitted that he "did not inform the prosecutor or defense counsel before entering the jury room, and neither attorney was present as he spoke to the jurors." When Judge Mathesius returned to the courtroom and explained that he had discharged the jury for the day, counsel for defendant Byrd objected:

> MR. SCHNEIDER: Your Honor, I was downstairs on the second floor waiting with Mr. Schroth [counsel for co-defendant Dean], and I was told you were going upstairs to inquire of the jurors whether they wished to stay or go home. And this was done by you off the record, and you came out and told me that they want to go home. I object to that. It's—
>
> THE COURT: All right. You object to that.
>
> MR. SCHNEIDER: I also think the jurors should be brought out and dismissed in the presence of the Court and on the record, and in front of the defendants.
>
> THE COURT: Thank you. You can do that when you're a judge. I'll do it the way I do it when I'm a judge. . . .

After explaining that he would discharge the jury at 4:00 p.m. and that he would take the court reporter with him as he did so, Judge

---

[2] Although Judge Mathesius admits that he entered the jury room while the jury was deliberating and that he did so without notifying either counsel for the defendant or the prosecutor, Judge Mathesius explained that he did so in the company of a Sheriff's Officer. In the context of this judicial discipline matter, that is a distinction without a difference.

Mathesius did not excuse counsel. Instead, he required that they remain until after the jury was excused. Upon his return to the courtroom, the following colloquy ensued:

> THE COURT: I've excused the jury, and they're going to return tomorrow 9:00 a.m. All three of you are as well. I'll see you tomorrow morning at 9:00.
>
> MR. SCHNEIDER: I'd like to make a motion. If there's going to be communication with the jury, I think it should be only in court.
>
> THE COURT: It doesn't sound like a motion. Was there a motion attached to that?
>
> MR. SCHNEIDER: That's the motion. I think all of the communications between the Judge and the jury should be in open court on the record.
>
> THE COURT: Mr. Schneider, I appreciate very much your motion.

The following day, Judge Mathesius explained on the record, outside the presence of the jury, his reasons for communicating with the jury without either counsel or a court reporter present. In short, he explained that, given the age, condition, and availability of the physical facilities in the courthouse, collecting the lawyers and defendants in the courtroom solely to discharge the jury consumed both unnecessary time and the resources incurred in security and transport concerns. In Judge Mathesius's words,

> it's my concern, first of all, for the security of all concerned, and secondly, for the convenience of all concerned that non-substantive aspects of the trial, i.e., the excusing of the jurors for the day or the excusing of the jurors for lunch might be more readily accomplished without the intervening 30 to 45 minutes that it generally takes to put the whole show together.

When Judge Mathesius concluded his lengthy explanation, one of the defense counsel requested leave to respond. Judge Mathesius's response was curt: "No. I don't care to hear your response. Respond on the appeal if it's necessary."

The jury returned its verdicts later that afternoon, convicting both defendants of an assortment of criminal charges. After the jury was polled on its guilty verdicts, Judge Mathesius addressed the jury directly:

> Once again, ladies and gentlemen, you have [v]indicated this Court's faith in the jury system. Your verdict has been adequately and amply supported by the evidence. You have deliberated long, and you've deliberated hard. You've overcome disagreements and the strife that necessarily is imposed upon jurors in such critical and difficult decision making.... You are the bulwark and the foundation of the jury system in this country and have acquitted it nicely.

At the formal hearing before the Advisory Committee, an assistant Mercer County prosecutor appearing as a witness on Judge Mathesius's behalf testified that, in his experience, "at the end of the day, sometimes obviously jurors are still deliberating [and] they need to be excused, [therefore, it is the] practice in Mercer County for judges to go in [to the jury room] and excuse those jurors for the day, without counsel being present[,]" asserting that "judges merely walk into the [jury] room and excuse the jurors and that's it." Judge Mathesius then explained that, due to the configuration of the Mercer County Courthouse and the fact that the defendants were housed in separate detention areas, it would have taken "35 to 45 minutes" to return the defendants to the courtroom in order to excuse the jury for the night. Judge Mathesius then admitted that, while his entry into the jury room during deliberations without counsel "may be wrong procedurally, ... it was a practical consideration that I thought over weighed the procedural requirements."

Judge Mathesius tendered neither an explanation nor an excuse concerning the colloquy with defense counsel; he readily acknowledged that he "did not, in that colloquy, behave in what we can describe as a patient[,] dignified[,] and courteous fashion[.]" Finally, Judge Mathesius maintained that his comments to the jury after its verdict did not "constitute[ ] a commendation of the jury[.]" In support of that conclusion, Judge Mathesius relied on the following standard closing instruction used in Mercer County for thanking and discharging a trial jury: [3]

> Ladies and gentlemen of the jury, the function that you have performed is one of the most important tasks that you will ever be called upon to fulfill. With the return of your verdict, your service in this case is complete.

---

[3] The first paragraph of the standard language used for the dismissal of jurors in Mercer County is almost identical to the first paragraph of *Criminal Model Charges—Dismissal of Jury* (approved Mar. 29, 1994). The last entry in the Model Charge instructs the judge to thank the jurors for their service, without providing, however, specific language therefor.

> I know that your stay with us has involved sacrifice on your part. I trust you leave here knowing that you have made a meaningful contribution to the judicial process and hope that you have enjoyed the experience.
>
> You have been a serious, attentive and extremely diligent jury. It has been my pleasure to have worked with you. On behalf of everyone in the court room, the citizens of Mercer County and the entire judicial system, I thank you each and every one of you. We greatly appreciate your willingness to serve and your service.
>
> You are now discharged. Thank you very much! When you return to the jury room, I would ask you to wait assembled there for a minute so I can thank you in person.

In Judge Mathesius's view, his statement to the jury, when viewed in the context of the Mercer County standard closing instructions, constituted "a standard couple of lines that are given to the jury so that [they] at least understand and appreciate that their work has been appreciated. It's not a commendation, as I understand it."

 The Advisory Committee concluded that, as a result of each of these claims—entering the jury room without counsel and off the record, addressing counsel in the colloquy in respect of those events, and commending the jury on its verdict—Judge Mathesius had violated Canons 3A(6), 3A(3), and 3A(10), respectively. Specifically, as to the first claim, the Advisory Committee found that "[a] judge has no right to speak to jurors outside the presence of counsel during trial, and certainly not off the record in the jury room." Thus, the Advisory Committee concluded that "[b]y entering the jury room outside the presence of counsel before the jury delivered its verdict, [Judge Mathesius] violated Canon 3A(6) of the *Code of Judicial Conduct,* which requires judges to accord to every person who is legally interested in a proceeding, or that person's lawyer, full right to be heard according to law." In respect of the second claim, the Advisory Committee recognized that Judge Mathesius "admit[ted] that his remarks were inappropriate" and, for that reason, concluded that Judge Mathesius "violated Canon 3A(3) of the *Code of Judicial Conduct,* which requires judges to be patient, dignified, and courteous to attorneys and others."

■ Finally, the Advisory Committee rejected Judge Mathesius's interpretation of his post-verdict comments to the jury, reasoning that his comment "is a commendation for reaching the right decision[,]" and concluding that such action "violate[s] Canon 3A(10) of the *Code of Judicial Conduct*, which prohibits judges from commending or criticizing jurors for their verdict." In the aggregate, the Advisory Committee concluded that Judge Mathesius's actions in respect of Count Two "also violated Canons 1 and 2A of the *Code of Judicial Conduct* and constituted conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of *Rule* 2:15–8(a)(6)."

### 3. *Criticism of fellow judges—State v. Fletcher.*

■ In respect of Count Three, Judge Mathesius stipulated in writing as to the events that unfolded after the August 31, 2005 Appellate Division reversal of a conviction and sentence arising from a trial over which he presided. *State v. Fletcher*, 380 *N.J.Super.* 80, 880 *A.*2d 1171 (App.Div.2005). In *Fletcher*, the Appellate Division held that there were two separate sources of reversible error. First, the panel determined that there was "error in the jury instruction on accomplice liability requir[ing] reversal of defendant's convictions." *Id.* at 85, 880 *A.*2d 1171.[4] Second, the Appellate Division "conclude[d] that defendant's [pretrial] statements were not made freely and voluntarily and may not be admitted into evidence at defendant's second trial." *Ibid.*

Judge Mathesius's actions following the Appellate Division's reversal of *Fletcher* were, in short, inexplicable. On September 14, 2005, while attending a dinner held by the Mercer County Bar Association, Judge Mathesius, without identifying himself, approached the law clerk of the author of the Appellate Division opinion and told the law clerk to deliver a message to her judge: that the judge was "inexperienced and not competent." On Sep-

---

[4] No additional discussion is presented in respect of the jury instruction issue because, "[a]t the court's direction, the discussion of the jury instruction on accomplice liability has been omitted from [the] published decision." *Ibid.*

tember 26, 2005, Judge Mathesius took matters a step further and wrote to the Appellate Division Judge.[5] In that letter, Judge Mathesius bluntly asserted that the Appellate Division Judge was uninformed and impractical. Judge Mathesius accused the Appellate Division Judge of having engaged in a "folly" that "breed[s] a sense of Dickensian disrespect of the law not only to its practitioners, but to the general public at large[,]" and concluded that the Appellate Division opinion in *Fletcher* "indulge[d] in fictive and romantic imagination." [6]

Upon reflection, Judge Mathesius admitted that, in his comments to the law clerk, he was "lash[ing] out against the judge[.]" Upon further consideration of the contents of the letter, Judge Mathesius conceded that "[i]t's hard for me to say how inappropriate it was. By way of saying, I could say grossly inappropriate, I could say hideously inappropriate, or I can just plain say stupid." Judge Mathesius summed it up best when he concluded that the letter "was improper in every respect."

The Advisory Committee concluded that Judge Mathesius's actions

demonstrate gross disrespect of the judicial system, the settled procedures for the handling and disposition of cases, and for the appellate process and judicial review in the adjudication of cases. They constitute conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of *Rule* 2:15–8(a)(6).

---

[5] The text of that letter is set forth in full in the appendix to this opinion.

[6] The formal complaint also alleged, and the Advisory Committee and Judge Mathesius stipulated in writing, that, during his attendance at the Judicial College in November 2005, Judge Mathesius may have acted improperly in respect of two of the Appellate Division Judges who served on the panel that decided *State v. Fletcher*. We need not reach those facts, as we are mindful of Justice William O. Douglas's description of the rigors a judge is expected to endure, explaining that the "law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men [and women] of fortitude, able to thrive in a hardy climate." *Craig v. Harney*, 331 *U.S.* 367, 376, 67 *S.Ct.* 1249, 1255, 91 *L.Ed.* 1546, 1552 (1947). Judge Mathesius has apologized separately to both judges.

[Judge Mathesius's] expression of his personal views and strong criticism to various persons manifested a lack of proper judicial temperament, balance and judgment. It exhibited disrespect and a lack of deference to appellate courts that reflects adversely on the proper and sound administration of justice and [Judge Mathesius's] capacity to preside over cases fairly, objectively and without prejudgment, consistent with appellate dispositions. These expressions of personal feelings were inconsistent with the deference and respect required in the orderly and proper administration of justice, and violated Canon 1 of the *Code of Judicial Conduct*, which requires judges to observe high standards of conduct to maintain the integrity and independence of the Judiciary, and Canon 2A, which requires judges to respect and comply with the law and to act at all times in a manner that promotes public confidence in the integrity and impartiality of the Judiciary.

### 4. *Pattern of improper conduct.*

■ Count Four of the formal complaint alleges that Judge Mathesius has engaged in a pattern of improper conduct that "violate[s] Canons 1 and 2A of the *Code of Judicial Conduct* and has engaged in conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of *Rule 2:15–8(a)(6)*." According to that complaint, the pattern of improper conduct consists of seven discrete events. The first of these arose in respect of a public "thank you" letter to the editors of two local newspapers Judge Mathesius wrote while still a municipal court judge. In a July 11, 2001 letter of admonition, the Advisory Committee explained to Judge Mathesius that such actions were "political in nature" and, hence, inappropriate under the commentary to Canon 2 of the *Code of Judicial Conduct*.[7]

The second instance cited in the formal complaint arose on September 19, 2003, when, while imposing a sentence on a defendant who shot another, Judge Mathesius engaged in personal observations concerning the wisdom of owning firearms. Those personal observations led to the following statement: "And the NRA says, well, everybody should have a gun, you know, and all

---

[7] That Commentary provides, in part, that "[a] judge must avoid all impropriety and appearance of impropriety and must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on personal conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly." Commentary, *Code of Judicial Conduct,* Canon 2.

that stuff. It's as stupid and as ignorant as people can be." In a May 11, 2004 letter of admonition, the Advisory Committee labeled those comments as "inappropriate" because they represented "an expression of a personal opinion that could cause the public to think that you have preconceived views, a bias that would prevent you from being fair and impartial as a judge in such a case." In that letter of admonition, the Advisory Committee noted that it "had prior dealings with [Judge Mathesius] concerning the public expression of [his] personal views." Despite certain misgivings, "[t]he majority of the [Advisory] Committee . . . decided to resolve this matter privately in the hope that you will avoid repetition of such conduct." Presciently, Judge Mathesius was warned that "[s]hould similar conduct recur, however, the Committee will have no choice but to institute formal proceedings."

The third and fourth instances listed in the formal complaint as part of the alleged pattern of improper conduct arose in the context of an informal conference held between the Advisory Committee and Judge Mathesius on October 27, 2004. *See R.* 2:15–11 (providing that "[a]t any time while a matter is pending before it, the Committee may conduct an informal conference with the judge and, in the discretion of the Committee, with the grievant" that may result in dismissal of grievance, imposition of private discipline, or institution of formal proceedings). The earlier of those involved Judge Mathesius's comments to the defendant in *State v. Anderson.* In Anderson, the defendant was charged with first-degree aggravated sexual assault, in violation of *N.J.S.A.* 2C:14–2a, and second-degree sexual assault, in violation of *N.J.S.A.* 2C:14–2c. As a result, if convicted, the defendant faced a presumptive period of incarceration. *See N.J.S.A.* 2C:44–1d (describing presumption of imprisonment for first—and second-degree crimes); *N.J.S.A.* 2C:43–6a (listing range of imprisonment term for first-degree crime as between ten and twenty years, and range of imprisonment term for second-degree crime as between five and ten years). At a status conference in that matter, Judge Mathesius, taking umbrage with the defendant's attire that day, engaged in the following colloquy:

THE COURT: Put your hands behind you, Mr. Anderson. Mr. Anderson, if you go to trial, are you going to dress like this? This [is] like a court, not like a basketball court. Is that the way you're going to dress?

THE DEFENDANT: I don't know. I just put this on today.

THE COURT: Where do you think you're going? Shoot some hoops this afternoon? Because it's a nice day out.

THE DEFENDANT: Play basketball.

THE COURT: Yeah, because you look like you're ready to do some athletic stuff. Is that what the rest of your day [you are] going to be doing, watching the World Series? What are you going to be—don't look around. Next time you come in here, dress like you're going to court, like if you're convicted, you're going to come to jail for ten years.

THE DEFENDANT: Why you coming down on me?

THE COURT: Because you're dressed inappropriately. Don't look around.

Would you advise your client the next time he comes in, dress like he's actually going to a court, that it's a major event in his life.

[DEFENSE COUNSEL]: Every other time he showed up properly dressed.

THE COURT: Maybe he has something to do, maybe it's a basketball game this afternoon.

[DEFENSE COUNSEL]: I had no reason to comment before today. I will comment to him later on.

THE COURT: I mean, folks, this is a courtroom. You're looking at people going to jail, probation. You're looking at serious stuff. You're not looking at shooting hoops or whatever else you might be doing. You understand what I'm saying, Mr. Anderson, or don't you.

THE DEFENDANT: I don't, no.

THE COURT: I'll tell you what. [Defense counsel] will clear up the picture when you go outside. If you don't know what's appropriate going to a Superior Court, think about doing 20 years in jail then, come back like that. Wear something like a Donovan McNabb shirt or something like that. That would be good.

[DEFENSE COUNSEL]: I will take care of that, Judge.

THE COURT: And don't mumble. And don't shake your head.

THE DEFENDANT: Why are you attacking me? I haven't done anything.

THE COURT: Because you're acting like a fool now.

THE DEFENDANT: Just standing here?

THE COURT: Standing there in your little outfit, yes. All right, I'll tell you what. Why don't you just leave, just go out of here. Get out of here. Get.

[Defense counsel], would you explain to Mr. Anderson what his problem with me—don't go jacking your finger back here.

[DEFENSE COUNSEL]: I'll explain it to him.

THE COURT: Go ahead. You got something else you want to say, Mr. Anderson, before you leave? End up in jail today.

[DEFENSE COUNSEL]: Judge, I'll talk to Mr. Anderson.

THE COURT: Please do. He has a little bit of a difficulty, and if we have him at trial, he will have more of a difficulty with me.

At a later proceeding, and by way of plea bargain, the State had offered to dismiss these charges in exchange for the defendant's plea to the disorderly persons offense of lewdness, in violation of *N.J.S.A.* 2C:14–4a,[8] which carries a maximum penalty of six months imprisonment, *N.J.S.A.* 2C:43–8, and a presumption of non-incarceration, *N.J.S.A.* 2C:44–1e. When the defendant rejected that plea offer at a later proceeding and insisted on proceeding to trial, Judge Mathesius exploded: "Mr. Anderson, are you nuts? Do you know if you go—if you go down on this case, you're going to state prison and get an Avenel [sexual offender] examination. Are you aware of that, or is that something that doesn't occur to you?" In response, the defendant immediately made his position clear: "I'm not pleading guilty to something I didn't do."

The latter of the two instances raised during the informal conference held on October 27, 2004 between the Advisory Committee and Judge Mathesius involved Judge Mathesius's ruling in respect of the post-conviction relief petition filed in *State v. Harris*, a ruling ultimately reviewed by this Court. *State v. Harris (Harris III)*, 181 *N.J.* 391, 859 *A.2d* 364 (2004), *cert. denied,* —— *U.S.* ——, 125 *S.Ct.* 2973, 162 *L.Ed.2d* 898 (2005). In *Harris III*, we explained that:

> Review of an application for post-conviction relief in a capital case, eight years after the defendant's trial and sentencing, is a daunting task under any set of circumstances. It is made more difficult in this instance due to the conduct of the PCR trial court. That conduct requires us to determine initially whether we can place any confidence in the PCR court's findings and conclusions.
>
> We explain. Ordinarily our review would be based on the findings and conclusions of the PCR trial court. *R.* 3:22–11; *R.* 2:2–1(a)(3). However, certain written and in-court statements of that court complicate our review. We will not recount those statements in detail here, except to note their thrust. . . .

---

[8] A disorderly persons offense is "not [a] crime[ ] within the meaning of the Constitution of this State" and "[c]onviction of such offenses shall not give rise to any disability or legal disadvantage based on conviction of a crime." *N.J.S.A.* 2C:1–4b.

> The balance of the court's statements contain what only can be described as outrageous, sarcastic, and pejorative comments about this State's death penalty system and this Court's capital jurisprudence, including gratuitous personal attacks against current and former members of the Court. The court's statements reveal a disdain for defendant and a preordained view that its role in our capital-sentencing system is meaningless. The nature of its comments raise a *Caldwell*-like issue, namely whether we can affirm a post-conviction relief determination upholding a capital sentence "when [a PCR court seems] to believe that responsibility for determining the appropriateness of a death sentence rests not with [it] but with the appellate court which later reviews the case." *Caldwell v. Mississippi*, 472 *U.S.* 320, 323, 105 *S.Ct.* 2633, 2636, 86 *L.Ed.*2d 231, 235–36 (1985).
>
> [*Id.* at 410–11, 859 *A.*2d 364 (footnote omitted).]

Because Judge Mathesius's rhetoric "demonstrated a diminished sense of [his] unique responsibility in our capital sentencing process[,]" *id.* at 414, 859 *A.*2d 364, we determined to "nullify [Judge Mathesius]'s findings and conclusions." *Id.* at 413, 859 *A.*2d 364. Instead, we "conduct[ed] a *de novo* review of both the factual findings and legal conclusions [reached by Judge Mathesius] . . . ensur[ing] that our resolution of [each] claim [wa]s based on objective evidence in the record, and not on any credibility determination made by [Judge Mathesius]." *Id.* at 419, 859 *A.*2d 364. Judge Mathesius's explanation for his rejected reasoning in *State v. Harris* is that "he had been on the Superior Court bench for only one year at the time of the *Harris* case and would not have written his decision in the same way if he had it to do over again."

The fifth, sixth, and seventh instances of misconduct listed in the formal complaint and found by the Advisory Committee to be part of Judge Mathesius's pattern of improper conduct are the same instances which give rise to the allegations in Counts One, Two, and Three of the formal complaint, respectively.

In its consideration of these instances, the Advisory Committee succinctly reasoned as follows:

> What those earlier matters have in common with the present matters is that they all reflect [Judge Mathesius]'s poor judgment, impulsiveness and lack of self-control, and tendency to act without sufficient regard for the propriety or the consequences of his actions. He was offended by the jury's decision in the *McDaniels* case because he considered it to be the wrong result, so he angrily went to the jury room and vented his emotions. Without sufficient reflection or

understanding, he entered the jury room in the *Byrd and Dean* case during jury deliberations without advising counsel or bringing a court reporter, indifferent to the risk that jurors might spontaneously say something about the case itself. He snapped at defense counsel for objecting to that visit to the jury room and then showed his pique by returning to the jury room to dismiss the jurors for the day. His conduct in respect of the *Fletcher* case goes beyond impulsivity. In a lengthy, sarcastic, and personally insulting letter, he criticized the author of the *Fletcher* opinion; [and] he seized on a chance encounter with that judge's new law clerk to denigrate the judge. . . .

The Advisory Committee thus concluded that Judge Mathesius's "actions constitute[d] a pattern of improper conduct that calls into question his judgment, temperament, and ability to conform his conduct to the requirements of the *Code of Judicial Conduct.*"

## C.

Although he stipulated, admitted, or did not contest any of the operative facts charged, Judge Mathesius interposed certain affirmative defenses. In addition to a general denial that his conduct violated the *Code of Judicial Conduct*, Judge Mathesius asserted that "[i]nsofar as [his] conduct may have been wrongful, it was an error of judicial judgment, and not marked with moral turpitude which reveals a shortage of integrity and character[;]" and that the allegations concerning his statements about *State v. Fletcher*, the public "thank you" letter to the editors of two local newspapers Judge Mathesius wrote while still a municipal court judge that was the subject of the July 11, 2001 letter of admonition, and his comments in respect of *State v. Harris* "cannot form the basis of discipline insofar as [Judge Mathesius]'s comments are protected by the First Amendment of the Constitution of the United States." [9] The Advisory Committee rejected those defenses.

## D.

In the end, after reviewing the formal complaint and Judge Mathesius's answer and affirmative defenses to the formal complaint; after conducting a formal hearing at which five witnesses—

---

[9] Judge Mathesius later conceded that his comments in respect of *State v. Harris* were not protected by the First Amendment.

including Judge Mathesius—testified; after considering a fifteen-paragraph stipulation of facts, seventeen documentary exhibits tendered by the presenter (many with multiple sub-exhibits), and sixteen documentary exhibits offered by Judge Mathesius; and after considering Judge Mathesius's post-hearing brief tendered pursuant to *R.* 2:15-14(g), the Advisory Committee issued its Presentment. It concluded that Judge Mathesius had violated Canons 1, 2A, 3A(3), 3A(6), and 3A(10) of the *Code of Judicial Conduct* and *R.* 2:15-8(a)(6). By way of discipline, it recommended that Judge Mathesius be suspended for a period of six months, but that, in light of Judge Mathesius's long dedication to public service, only three months of that suspension be without pay.

On July 24, 2006, we ordered that Judge Mathesius "show cause before this Court why he should not be publicly disciplined through the imposition of an appropriate sanction that does not include removal from judicial office[.]" The order to show cause also assigned a presenter for the matter before us and set forth a briefing schedule. Both Judge Mathesius and the presenter filed timely briefs. In addition, the Mercer County Bar Association sought, and was denied, leave to appear in this judicial discipline matter as *amicus curiae.* Further, Judge Mathesius sought the disqualification of two members of this Court, which also was denied.[10]

Oral argument was heard on the Order to show cause on September 25, 2006. Judge Mathesius appeared with counsel and also separately addressed the Court.

## II.

### A.

*Rule* 1:18 provides the point of departure for our analysis: "It shall be the duty of every judge to abide by and to enforce the

---

[10] For reasons unrelated to Judge Mathesius's application, Chief Justice Poritz recused herself from participation in this matter.

provisions of the ... *Code of Judicial Conduct.* ..." The purpose undergirding the *Code of Judicial Conduct* and its concomitant system of judicial discipline is oft-repeated and well-recognized:

> The single overriding rationale behind our system of judicial discipline is the preservation of public confidence in the integrity and the independence of the judiciary. As we have noted before, "This Court cannot allow the integrity of the judicial process to be compromised in any way by a member of either the Bench or the Bar." Accordingly, institutional concerns figure prominently in cases involving judicial discipline. As the Supreme Court of Minnesota has observed, the standard of judicial conduct is a high one precisely "so that the integrity and independence of the judiciary may be preserved." Judicial misconduct "brings the judicial office into disrepute and thereby prejudices the administration of justice ... and diminishes public respect for the judiciary." Because public confidence in judges is essential to maintaining the legal system, "misconduct by a judge brings the office into disrepute and thereby prejudices the administration of justice."
>
> [*In re Seaman,* 133 *N.J.* 67, 96–97, 627 *A.2d* 106 (1993) (citations omitted).]

We have explained that, "once the Court decides that there has been a breach of judicial ethics, its goal is not so much to punish the offending judge as to restore and maintain the dignity and honor of the position and to protect the public from future excesses." *In re Subryan,* 187 *N.J.* 139, 153, 900 *A.2d* 809 (2006) (citations and internal quotation marks omitted).

 We "review[ ] a disciplinary matter presented by the [Advisory Committee] de novo under the [clear and convincing evidence] standard of proof." *Id.* at 145, 900 *A.2d* 809. We have explained that "[i]n our evaluation of the record, we independently consider whether the facts demonstrate conduct that is incompatible with the canons of judicial conduct[, and that a] *de novo* hearing provides a reviewing court with the opportunity to consider the matter anew, afresh and for a second time." *Ibid.* (citations, internal quotation marks and editing marks omitted). It is, then, with the sole purpose of preserving public confidence in the integrity and the independence of the judiciary that we review *de novo* the Advisory Committee's findings in respect of Judge Mathesius.

### B.

All of the relevant facts and the operative legal contentions in this case were either stipulated, admitted, or not contested. We

find that those the proofs establish, by clear and convincing evidence, the violations cited in the formal complaint. Therefore, we turn to Judge Mathesius's defenses to the violations charged to determine whether, as a matter of law, they are valid.

## C.

Judge Mathesius's defense to the charges presented in the formal complaint was three-fold. First, Judge Mathesius asserted a general denial that his conduct violated the *Code of Judicial Conduct.* Next, Judge Mathesius asserted that if his conduct was wrongful, it was not the product of ill-will or malice but, rather, "it was an error of judicial judgment, and not marked with moral turpitude which reveals a shortage of integrity and character." Finally, addressing specifically his statements about *State v. Fletcher* and the public "thank you" letter to the editors of two local newspapers he wrote while still a municipal court judge that was the subject of the July 11, 2001 letter of admonition, Judge Mathesius asserted that he could not be penalized for the exercise of his constitutional right of freedom of expression embodied in the First Amendment to the United States Constitution.[11] In the main, we reject these defenses.

"Canon 1 of the *Code of Judicial Conduct* requires judges to uphold the integrity and independence of the judiciary, and Canon 2A requires judges to respect and comply with the law and promote public confidence in the integrity and impartiality of the judiciary." *In re Subryan, supra,* 187 *N.J.* at 152–53, 900 *A.*2d 809 (internal quotation and editing marks omitted). Canon 3A(3) of the *Code of Judicial Conduct* provides that "[a] judge should be patient, dignified, and courteous to litigants, jurors, witnesses,

---

11 *U.S. Const.* amend. I provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech...." Our State Constitution, on which Judge Mathesius does not rely, is more precise: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech...." *N.J. Const.* art. I, ¶ 6.

lawyers, and others with whom the judge deals in an official capacity...." Canon 3A(10) of the *Code of Judicial Conduct* provides that "[a] judge shall not commend or criticize jurors for their verdict, other than in a court order or opinion in a proceeding, but may express appreciation to jurors for their service to the judicial system and the community." Finally, we have previously held that *"Rule* 2:15–8(a)(6) prohibits judges from engaging in 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.'" *In re Subryan, supra,* 187 *N.J.* at 153, 900 *A.*2d 809.

There can be no doubt that Judge Mathesius's conduct, as charged in the formal complaint as a whole, violated Canon 1 of the *Code of Judicial Conduct.* That Canon explains that "[a]n independent and honorable judiciary is indispensable to justice in our society." *Code of Judicial Conduct,* Canon 1. For that reason, Canon 1 also explains that "[a] judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved." *Ibid.* The *Code of Judicial Conduct* thus does not countenance Judge Mathesius's repeated behavior as charged in the complaint. As we made clear in *In re Seaman, supra,* 133 *N.J.* at 95, 627 *A.*2d 106, "the canons are not mere platitudes. They direct each judge in conducting himself or herself in office, and guide the Court in determining when judicial misconduct has occurred." Judge Mathesius's post-verdict comments to the jury in *State v. McDaniels,* his conduct in respect of both the jury and defense counsel in *State v. Byrd and Dean,* his patently offensive criticism of fellow judges in *State v. Fletcher,* and his proven pattern of improper conduct inescapably lead to the singular conclusion that Judge Mathesius violated Canon 1.

Similarly, there can be no doubt that the very behavior that constituted a violation of Canon 1 also clearly and convincingly established a violation of Canon 3A(3) of the *Code of Judicial Conduct,* which commands that "[a] judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers,

and others with whom the judge deals in an official capacity...."
*Code of Judicial Conduct,* Canon 3A(3). Also, Judge Mathesius's behavior in respect of entering the jury room without counsel or a court reporter present clearly and convincingly established that he violated Canon 3A(6) of the *Code of Judicial Conduct,* which requires that "[a] judge should accord to every person who is legally interested in a proceeding, or that person's lawyer, full right to be heard according to law[.]" *Code of Judicial Conduct,* Canon 3A(6). Further, in his condemnation of the jury in *State v. McDaniels* and, to a lesser extent, in his praise of the jury in *State v. Byrd and Dean,* Judge Mathesius clearly and convincingly violated Canon 3A(10) of the *Code of Judicial Conduct,* which instructs that "[a] judge shall not commend or criticize jurors for their verdict, other than in a court order or opinion in a proceeding, but may express appreciation to jurors for their service to the judicial system and the community." *Code of Judicial Conduct,* Canon 3A(10). Finally, in the aggregate, that behavior clearly and convincingly establishes "conduct prejudicial to the administration of justice that brings the judicial office into disrepute[,]" in violation of *Rule* 2:15–8(a)(6).

That said, we address Judge Mathesius's remaining two defenses. In respect of Judge Mathesius's claim that his conduct, if wrongful, "was an error of judicial judgment, and not marked with moral turpitude which reveals a shortage of integrity and character[,]" we observe that, for the reasons we explore more fully in Section III.C. of this opinion, *infra,* 188 *N.J.* at 525–26, 910 *A.2d* at 613 (2006), those considerations are properly addressed in the determination of the proper quantum of discipline to be imposed, and are not relevant to the determination whether liability for breaches of the *Code of Judicial Conduct* exists.

█ In the end, we categorically reject Judge Mathesius's expansive claim that the First Amendment immunizes his statements about *State v. Fletcher,* or the public "thank you" letter to the editors of two local newspapers Judge Mathesius wrote while still a municipal court judge that was the subject of the July 11,

2001 letter of admonition. Although we have held that "[a] judge does not relinquish his or her First Amendment rights on ascending to the bench[,]" we also have made clear that "limitations may be placed on a judge's First Amendment rights." *In re Broadbelt,* 146 *N.J.* 501, 517, 683 *A.2d* 543 (1996) (citations omitted).

Adopting the *Gentile/Hinds* standard of review, *Gentile v. State Bar of Nevada,* 501 *U.S.* 1030, 111 *S.Ct.* 2720, 115 *L.Ed.*2d 888 (1991); *In re Hinds,* 90 *N.J.* 604, 449 *A.2d* 483 (1982), we have explained that "the regulation of a judge's speech will be upheld if it furthers a substantial governmental interest unrelated to suppression of expression, and is no more restrictive than necessary." *In re Broadbelt, supra,* 146 *N.J.* at 519, 683 *A.2d* 543. We have concluded that "[t]he preservation of the independence and integrity of the judiciary and the maintenance of public confidence in the judiciary ... are obviously interests of sufficient magnitude to sustain [the] Canons under the *Gentile/Hinds* standard[.]" *Id.* at 519–20, 683 *A.2d* 543. Thus, we declared ourselves "satisfied that the restrictions on a judge's speech imposed by those Canons are no greater than necessary." *Id.* at 520, 683 *A.2d* 543.

Judges in New Jersey are appointed by the Governor, with the advice and consent of the State Senate. *N.J. Const.* art. § VI, VI, ¶ 1. In accepting that appointment, New Jersey judges also "accept restrictions on personal conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly." Commentary, *Code of Judicial Conduct,* Canon 2. Some of these restrictions are of constitutional dimension. *See, e.g., N.J. Const.* art. VI, § VI, ¶ 2 (requiring minimum of ten years admission to New Jersey Bar); *N.J. Const.* art. VI, § VI, ¶ 3 (limiting initial appointment to seven years and providing that they "shall be retired upon attaining the age of 70 years"); *N.J. Const.* art. VI, § VI, ¶ 6 (forbidding justices and judges "while in office, [from] engag[ing] in the practice of law or other gainful pursuit"); *N.J. Const.* art. VI, § VI, ¶ 7 (prohibiting justices and judges from holding any "other office or position, of profit, under this State or the United States"). Other limitations are set forth

in the duly enacted laws of this State, the *Code of Judicial Conduct*, our *Rules of Court*, and our decisional law. Some of those restrictions may otherwise abridge a private person's free speech rights. But, by his own choice, Judge Mathesius is not a private person. He is a judge. As a condition of service as a judge, Judge Mathesius vowed to comply with the basic standard all New Jersey judges proudly uphold daily. Nothing more is asked of Judge Mathesius, and nothing less is expected of him.

### III.

### A.

Having determined that violations of Canons 1, 2A, 3A(3), 3A(6), and 3A(10) of the *Code of Judicial Conduct* and *R.* 2:15–8(a)(6) have been established against Judge Mathesius by clear and convincing evidence, the task of determining the proper quantum of discipline remains. The Advisory Committee recommended the imposition of a six-month suspension from judicial duties, but that "only three months of his suspension be without pay." In contrast, Judge Mathesius urges that "[o]n balance, there is no justification for any discipline more severe than reprimand in this matter." [12]

*In re Seaman* sets forth the standards that inform the assessment of the proper amount of discipline to be imposed:

> [T]he determination of sanctions in judicial-discipline cases is not so much to punish the offending judge as to restore and maintain the dignity and honor of the position and to protect the public from future excesses. We concur with the Supreme Court of Maine in its description of the fundamental purpose behind disciplining a judge:
>
>> To instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned. We

---

[12] Before us, Judge Mathesius argued that the proper quantum of discipline in his case is a reprimand. In his submissions to the Advisory Committee *before* it made its recommendation of a six month suspension, Judge Mathesius urged a censure—a more severe form of discipline—as the proper quantum of discipline.

discipline a judge to reassure the public that the judiciary of this state is dedicated to the principle that ours is a government of laws and not of men.

In keeping with that high purpose, we do not discipline for mere errors in judicial activity or professional activities. Rather, the disciplinary power is ordinarily reserved for conduct that is marked with moral turpitude and thus reveals a shortage in integrity and character. Thus, we have held that judicial misconduct, for example, involving dishonesty of any kind will ordinarily require removal as the appropriate discipline.

The determination of appropriate discipline requires more than establishing some instance or instances of unethical conduct. We must undertake a more searching and expansive inquiry carefully scrutinizing the substantive offenses that constitute the core of respondent's misconduct, the underlying facts, and the surrounding circumstances in determining the nature and extent of discipline. Among the surrounding circumstances to which we give heed are the considerations of public policy and the legitimate interests to which the State of New Jersey has made a governmental commitment.

. . . .

Other aggravating factors serve to define the gravity of misconduct. Those include the extent to which the misconduct, like dishonesty, or a perversion or corruption of judicial power, or a betrayal of the public trust, demonstrates a lack of integrity and probity; whether the misconduct constitutes the impugn exercise of judicial power that evidences lack of independence or impartiality; whether the misconduct involves a misuse of judicial authority that indicates unfitness; whether the misconduct, such as breaking the law, is unbecoming and inappropriate for one holding the position of a judge; whether the misconduct has been repeated; and whether the misconduct has been harmful to others.

[*Supra*, 133 *N.J.* at 97–99, 627 *A.*2d 106 (citations, internal quotation marks, and editing marks omitted).]

## B.

In the exercise of its obligations in respect of the appropriate level of discipline to be imposed on Judge Mathesius, the Advisory Committee concluded as follows:

[Judge Mathesius] is intelligent and, by all accounts, a competent, fair and hard-working jurist. This assessment is supported by his evaluations in connection with the Judicial Performance Program. Nevertheless, when frustrated, disappointed or angry, he has acted impulsively and without restraint. The jurors in the *McDaniels* case were witnesses to that tendency on his part; a major reason they were shocked by his outburst in the jury room was because his manner contrasted so sharply with the professional manner with which he presided over the trial.

[Judge Mathesius] recognizes that he is prone to such conduct, and he has arranged for professional assistance in that regard. He attributes such conduct to his prior experience as a political figure, which, he claims, accounts for his penchant

for spontaneity and bluntness and which he acknowledges must be restrained if he is to continue in his current role as a judge.

The character of [Judge Mathesius]'s improper conduct, however, is so serious and prolonged that it calls for a severe measure of public discipline. Accordingly, the [Advisory] Committee respectfully recommends that he be suspended for a period of six months. Because [Judge Mathesius] has spent most of his adult life in public service, the [Advisory] Committee recognizes that six months without compensation could be financially onerous. Therefore, the [Advisory] Committee recommends that only three months of his suspension be without pay.

Judge Mathesius concedes that his "misconduct is episodic, [and] happens more frequently than it should[.]" He asserts, however, that this behavior is "far from routine." He also notes that although his "colleagues did acknowledge that he can be too outspoken, every Judge [who] has had any significant contact with [Judge Mathesius] has lauded him in many ways[,]" something that has not escaped our attention. Judge Mathesius "acknowledges, without equivocation, that he erred and he erred in very serious ways." He explains that "[h]e is committed to avoiding any future problem" and that he has sought assistance to achieve that goal. He concludes by arguing that

[he] has had occasions of improper behavior, but he has done much more that is right. His Judicial Evaluation survey reports on a jurist who comports himself well. He brings great skill and intelligence to his calling and is widely recognized as a compassionate jurist and a helpful colleague. One who, [Judge Mathesius] respectfully submit[s], is worthy of compassion. . . .

## C.

Judge Mathesius presents an almost indecipherable riddle. On the one side, we have been presented the portrait of a sixty-six year old man who has been an attorney in this State since 1965, a long-time public servant who is learned in his craft, willing to assist his colleagues, and generous with his time and knowledge. On the other side, however, we have been presented indisputable proof of repeated and unremorseful instances of petulance, sarcasm, anger, and arrogance; these have no place in the exercise of judicial duties. Therefore, although we have explained that "the disciplinary power is *ordinarily* reserved for conduct that 'is marked with moral turpitude and thus reveals a shortage in

integrity and character[,]' " *In re Seaman, supra,* 133 *N.J.* at 97, 627 *A.*2d 106 (quoting *In re Mattera,* 34 *N.J.* 259, 270, 168 *A.*2d 38 (1961)) (emphasis supplied), this case is far from ordinary.

The overwhelming majority of New Jersey judges hold judicial office as a cherished privilege, and well and truly serve for decades without a blemish. In contrast, Judge Mathesius, in less than five years, has been before the Advisory Committee four separate times, resulting in two letters of admonition, one informal conference, and one Presentment. We, therefore, must "undertake 'a more searching and expansive inquiry ... carefully scrutiniz[ing] the substantive offenses that constitute the core of [Judge Mathesius]'s misconduct, the underlying facts, and the surrounding circumstances in determining the nature and extent of discipline.' " *Id.* at 98, 627 *A.*2d 106 (quoting *In re Collester,* 126 *N.J.* 468, 472, 599 *A.*2d 1275 (1992)). We look to the remaining factors delineated by *In re Seaman* for guidance.

Judge Mathesius's repeated breaches of the considerations embodied in the *Code of Judicial Conduct* and *R.* 2:15–8(a)(6) unmistakably demonstrate that "the considerations of public policy and the legitimate interests to which the State of New Jersey has made a governmental commitment" are implicated by his actions. *Ibid.* We do not conclude that Judge Mathesius's misconduct "demonstrates a lack of integrity and probity[.]" *Ibid.* (citing *In re Coruzzi,* 95 *N.J.* 557, 572, 472 *A.*2d 546 (1984)). We do, however, conclude that Judge Mathesius's misconduct "constitutes the impugn exercise of judicial power that evidences a lack of independence or impartiality," *id.* at 99, 627 *A.*2d 106 (citing *In re Yaccarino,* 101 *N.J.* 342, 502 *A.*2d 3 (1985)); that his misconduct "involves a misuse of judicial authority that indicates unfitness," *ibid.* (citing *In re Yaccarino, supra*); that "the misconduct has been repeated," *ibid.* (citing *In re Collester, supra,* 126 *N.J.* at 473, 599 *A.*2d 1275); and that Judge Mathesius's "misconduct has been harmful to others[,]" *ibid.* (citing *In re Connor,* 124 *N.J.* 18, 26–27, 589 *A.*2d 1347 (1991); *In re Albano,* 75 *N.J.* 509, 384 *A.*2d 144 (1978); *In re Yengo,* 72 *N.J.* 425, 371 *A.*2d 41 (1977)). In

mitigation, we acknowledge Judge Mathesius's otherwise overall good reputation,[13] lengthy public service, and the fact that Judge Mathesius has recognized the need for corrective assistance, which he has actively sought.

A fair balance of those factors leads us to conclude that the imposition of a period of suspension is appropriate. That balance leads us to conclude that the discipline recommended by the Advisory Committee—a six-month suspension from judicial duties, three months of which without pay—is, albeit understandable, excessive, while the discipline urged by Judge Mathesius—a censure—is disproportionately insignificant in the circumstances presented. We find that Judge Mathesius's misconduct, although clearly culpable, does not rise to the level of misconduct that authorized a three-month suspension in *In re Williams*, 169 *N.J.* 264, 777 *A.*2d 323 (2001), or the two-month suspensions imposed in *In re Subryan, supra,* 187 *N.J.* at 156, 900 *A.*2d 809, *In re Seaman, supra,* 133 *N.J.* at 103, 627 *A.*2d 106, or *In re Collester, supra,* 126 *N.J.* at 476, 599 *A.*2d 1275.

In the end, we conclude that a thirty-day suspension without pay from judicial duties is an appropriate level of discipline in this matter. That conclusion is founded on our firm belief that a suspension from judicial duties is appropriate to allow Judge Mathesius the opportunity to reflect on his position of authority and the manner in which he exercises that position of authority. That conclusion is also based on the fact that earlier, lesser penalties have not deterred him from the improper exercise of his judicial authority. We so conclude mindful that "because each case is unique and requires individualized assessment, reasonable people may disagree about whether a greater or lesser sanction is required." *In re Subryan, supra,* 187 *N.J.* at 155, 900 *A.*2d 809.

---

[13] In this respect, the fact that one of the two defense counsel in *State v. Byrd and Dean* submitted a lengthy, positively glowing, and apparently unsolicited letter on Judge Mathesius's behalf is particularly poignant.

## IV.

In judicial discipline matters, we are guided by the overarching precept that "[t]he Judicial Department comes home in its effects to every man's fireside; it passes on his property, his reputation, his life, his all." *O'Donoghue v. United States,* 289 *U.S.* 516, 532, 53 *S.Ct.* 740, 743, 77 *L.Ed.* 1356, 1361 (1933) (quoting Marshall, C.J., *Debates of the Virginia State Convention of 1829–1830,* at 616). We understand that "the highest exercise of judicial duty is to subordinate one's personal pulls and one's private views to the law of which we are all guardians—those impersonal convictions that make a society a civilized community, and not the victims of personal rule." *Dunlap v. Friedman's, Inc.,* 213 *W.Va.* 394, 582 *S.E.*2d 841, 850 n. 4 (2003) (Davis, J. dissenting) (citations and internal quotation marks omitted). That is the unique lesson every judge must hold dear and one that, to date, has not been fully embraced by Judge Mathesius.

For the foregoing reasons, we conclude that Judge Mathesius, by clear and convincing evidence, violated Canons 1, 2A, 3A(3), 3A(6), and 3A(10) of the *Code of Judicial Conduct* and *R.* 2:15–8(a)(6). Finally, because we believe that this quantum of discipline highlights the importance of civility and, more importantly, impartiality to both the judiciary as a whole and to the public at large, we hold that Judge Mathesius be suspended for thirty days without pay from his judicial duties.

So ordered.

## *APPENDIX*

*Letter from Judge Mathesius to the Appellate Division Judge*
September 26, 2005

PERSONAL AND CONFIDENTIAL

Hon. XXXXXXX XXXXXXX

XXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXX

Dear XXXXX:

In light of our common Mercer County heritage, interestingly accentuated by the fact that you elected to participate as an appellate judge on a case which was tried while you were a fellow judge in the County, I'm taking the liberty of writing to you regarding your decision in *State v. Fletcher*. As you know, I was the trial judge in that case.

Upon having read your full opinion for the fourth time, may I suggest that it is paramount—at least for your efforts in future decision-authoring—that one grasps the crucial importance of having some scintilla of experience or, at least, a remote acquaintanceship with the subject matter of which one writes. This is not to say, of course, that such a postulate applies in every sense of a written undertaking. Obviously, the course of much fiction cannot be dependant upon only life's experiences.

However, I humbly propose that when one undertakes to write an opinion about such a remarkably arcane and confusing subject such as the Accomplice Instruction, some minimal level of experience in the criminal law in general and, more importantly, some specific level of experience in particular in the delivery of some of the more unintelligible charges the trial court is asked to give, is not unimportant. The absence of such experiences (and, putting speculation to the side) should invite a significantly greater degree of deference be accorded to the trial court and jury which actually heard and considered the testimony.

I hasten to add that not only did the Fletcher jury demonstrate an extraordinary comprehension of the five-hour charge as it was delivered (with the assistance of Power Point and having been given copies of the court's charge for use in its deliberations) but did so asking no questions regarding the exotica which was the unreported subject matter of your court's opinion. That fact—that the jurors asked no questions and returned a verdict precisely in accord with the facts as testified to after considering 17

separate charges and their lesser-included offenses—seems to militate against your inferred conclusions. It seems that the jurors were smarter than your court tends to believe. And, in short (and to the extent it is important), justice was accomplished by them.

While I imagine it is vital at least from an academic point of view that the trial courts are "informed," by learned appellate disquisitions, I submit that at the same time, the practical aspects of what transpires in the actual trial should not be sacrificed on the altar of the theoretical, philosophical, or metaphysical. In the instant case, defendant Fletcher was, in every respect, involved in a shotgun robbery and the associated beating of one of the three young victims. The niceties of your criticisms as they relate to complaints that the charge was "too abstract" are, frankly, overly pedantic and absurd given the larger picture of criminal jurisprudence. In my view, the folly of the decision tends, at long last, to breed a sense of Dickensian disrespect of the law not only to its practitioners, but to the general public at large.

As an aside, finally, trial courts are routinely advised that they should place their finding of facts and attendant reasoning on the record as such will, in turn, be granted substantial deference by the reviewing courts. I have found that such a representation is more honored in the breach. In Fletcher, having had the benefit of listening to the witnesses on direct and cross-examination, I was able to readily conclude that despite the loose exchange regarding what were and were not "off the record" comments between the defendant and a police officer-associate of defendant's brother, the defendant fully understood the Miranda warnings and was cognizant of, capable of, and did readily waive those rights, understanding as he did that what he said may be used against him in a court of law. To find otherwise is to indulge in fictive and romantic imagination.

I appreciate whatever consideration you may give to the above.
Sincerely,

/S/

BILL MATHESIUS

### ORDER

This matter having come before the Court on a Presentment of the Advisory Committee on Judicial Conduct, and respondent having been Ordered to Show Cause why he should not be publicly disciplined through the imposition of an appropriate sanction that does not include removal from judicial office, and good cause appearing;

It is ORDERED that SUPERIOR COURT JUDGE WILBUR H. MATHESISUS is hereby suspended from the performance of his judicial duties, without pay, for a period of thirty days, effective December 4, 2006, through January 2, 2007.

*For suspension*—Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—6.

Opposed—None.